# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1409

_____

Espanola Masterson,      *

    *

       Appellant,      *

    *    Appeal from the United States

v.     *    District Court for the

    *    Western District of Missouri.

Jo Anne B. Barnhart, Commissioner     *

of Social Security,     *

    *

       Appellee.     *

_____

Submitted: November 21, 2003

Filed: April 9, 2004

_____

Before WOLLMAN, BYE, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Espanola Masterson appeals the district court's[1] order affirming the Commissioner's denial of her Social Security disability claim. The district court found that substantial evidence of record supported the Administrative Law Judge's ("ALJ") determination that Masterson could return to her past work as a property manager. On

_____

[1] The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

appeal, Masterson contends that the ALJ's decision was not supported by substantial evidence. We affirm.

## I. *Background*

Masterson's medical reports show a history of arrhythmia, hyperglycemia, hypercholesterolemia, a small disc herniation at L4-L5 without nerve impingement, hypertension generally controlled with medication, mild venous insufficiency, osteoarthritis, and fibromyalgia. Various physicians treated Masterson over the course of her claimed disability period beginning September 13, 1999. The trial record contains numerous medical records, and we summarize the significant reports herein. Masterson saw Mark A. Greenfield, M.D., on November 4, 1999, complaining of back pain. An MRI revealed degenerative disc disease from L2-L3 through L5-S1, central disc bulging at L3-L4, and a small central disc herniation at L5-S1 without nerve impingement. Dr. Greenfield treated Masterson with a series of steroid nerve blocks and pain medication.

Masterson saw Lisa McPeak, M.D., on February 14, 2000, for a consultative examination at the direction of the Missouri office of Disability Determination. Masterson mainly complained of arthritic problems in her back, neck, shoulders, hands, hips, and knees. Masterson reported that she lived with three grandchildren ages ten, eleven, and fourteen. She was able to care for herself independently and assist in the care of her grandchildren. She could cook, perform light cleaning, and lift objects weighing ten to twenty pounds. On examination, Masterson was able to sit, stand, walk, handle items, hear, and speak without significant problems. She was also able to get on and off the examination table, which required her to step up on a stool and then lay down from a seated position. Her joint ranges of motion and palpation did not reveal significant joint swelling or warmth, but she did have crepitus in her knees and wrists. Masterson's deep-tendon reflexes and general strength were normal. Dr. McPeak noted that Masterson experienced generalized joint tenderness, muscle tenderness, and some range-of-motion limitations due to her

arthritic complaints. Dr. McPeak reported that Masterson appeared to have functional mobility skills, although they were slow. Dr. McPeak determined that Masterson experienced probable osteoarthritis, a history of Wolff-Parkinson-White Syndrome (an arrhythmia), controlled hypothyroidism, and hypertension. Dr. McPeak also noted that Masterson's heart and thyroid problems appeared fairly well controlled. Later anti-nuclear AB and rheumatoid factor testing was negative.

Finally, a medical record dated December 1, 2000, indicated that a physician diagnosed Masterson with fibromyalgia, and prescribed exercise and medication to control the condition. This diagnosis was repeated in two additional records: the first in a letter written by a nurse used to excuse Masterson from jury duty, and the second in a check-up report wherein Masterson reported the prior diagnosis.

At the administrative hearing, Masterson testified that she was fifty-four years old and had completed two years of college. She lived with and was the sole caretaker of her three grandchildren. Regarding her daily activities, Masterson testified that she woke her grandchildren in the morning for school, made herself breakfast, showered, washed dishes, helped her grandchildren with homework, and went to church. On good days, she completed household chores, including laundry, and cooked simple meals. She also went to the store but took along one of her grandchildren to do the lifting.

Masterson's past relevant work was as a property manager for an apartment building. This job required her to sit at a computer and type, perform inspections, file, deal with residents, decorate for holidays, work with vendors, clean, and make small repairs. Masterson claimed that she became disabled on September 13, 1999, when she was no longer able to perform this job due to pain and an inability to walk. She testified that she was disabled due to insomnia and severe pain in her shoulders, back, neck, ankles, hips, and knees. Masterson stated that a rheumatologist told her that she had fibromyalgia, and that she heard about it on television and believed that she had

similar symptoms. Masterson testified that she could stand for fifteen to twenty minutes before her legs hurt, walk one to two blocks before tiring, sit for fifteen to forty minutes until she experienced neck, back, and hip pain, lift five to ten pounds, and hold a pen for fifteen to twenty minutes before experiencing cramps. Masterson testified that she could not squat due to pain in her hips, back, and knees, and that she occasionally experienced shortness of breath and chest pain. She claimed that her left leg had given out about five times since September 1999. Masterson also claimed that she sometimes experienced difficulty thinking, expressing her thoughts, and remembering things.

Lynn Allen Curtis, M.D., testified as a medical expert at the administrative hearing. Dr. Curtis testified that the medical evidence confirmed the diagnoses of arrhythmia, a history of hyperglycemia, hypercholesterolemia, a herniated nucleus pulposus or herniated disc at L4-5, hypertension, mild venous insufficiency, osteoarthritis, and fibromyalgia. Dr. Curtis stated that she saw one diagnosis of fibromyalgia in the record. Dr. Curtis testified that Masterson's arrhythmia was controlled with medication. There was no muscle atrophy or spasm, and no evidence of any impingement on the spinal cord due to Masterson's herniated disc. Dr. Curtis believed that Masterson's hypertension was sometimes controlled with medication and her thyroid levels improved with thyroid-replacement therapy. Dr. Curtis testified that the doctors gave no restrictions to Masterson for her right-shoulder spurring. Based on the medical evidence, Dr. Curtis opined that Masterson could stand and walk six hours per day and sit for six to eight hours per day if she could get up every twenty minutes. Dr. Curtis further determined that Masterson had no lifting restrictions, but she should not use her arms above her head on her right side. Dr. Curtis gave no opinion regarding Masterson's abilities to bend, twist, squat, and climb because the record contained little medical evidence related to her back.

Lesa Keen, a vocational expert, also testified. Keen testified that Masterson's only past relevant work as a property manager was typically considered skilled and

light exertionally. However, Masterson described it as heavy work. Keen testified that a property-manager position typically allows for alternating among sitting, standing, and walking depending on the specific job duty, but not necessarily at will.

The ALJ posed a hypothetical question to Keen based on an individual of Masterson's age, education, and past work experience with the residual functional capacity ("RFC") to perform light work with a sit/stand option. In response, Keen testified that that person could perform work as a cashier, machine operator, and bench assembler. Keen also identified sedentary jobs such as receptionist and order clerk, which did not include a sit/stand option but included typical rest periods of a fifteen-minute mid-morning break, a thirty-minute lunch, and a fifteen-minute mid-afternoon break. Keen stated that the jobs of cashier, machine operator, bench assembler, receptionist, and order clerk typically would not involve working above shoulder level.

Following the hearing, the ALJ denied Masterson's claim after finding that her complaints of disabling pain were not credible when compared to Masterson's daily activities and the lack of medical evidence detailing objective findings. The ALJ determined that Masterson could perform light or sedentary work without right-arm overhead work, including her previous work as a property manager as it is generally performed in the economy. Thereafter, the Appeals Council denied Masterson's request for review. Thus, the ALJ's decision stands as the Commissioner's final decision.

## II. *Analysis*

Masterson argues that the ALJ erred in determining that she retained the RFC to return to her past relevant work. She argues that the ALJ failed to fully investigate and make findings regarding the demands of her past work or her capabilities.

We review de novo the district court's decision upholding the denial of Social Security benefits. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id*. If, after reviewing the record as a whole, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the Commissioner's decision. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). It is not our job to reweigh the evidence or review the factual record de novo. *McClees v. Shalala*, 2 F.3d 301, 302 (8th Cir. 1993). Weighing the evidence is a function of the ALJ, the fact-finder. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). Instead, we must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that she has a disabling impairment. *Pickner v. Sullivan*, 985 F.2d 401, 403 (8th Cir. 1993). However, "direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

A. *Residual Functional Capacity*

Masterson argues that the medical evidence does not support the ALJ's determination that she retains the RFC to perform her past relevant work. Specifically, Masterson argues that Dr. Curtis, a nonexamining physician, offered the

only medical opinion that assessed her RFC. Masterson argues that the ALJ erred in relying only on Dr. Curtis's opinion to determine that she had the RFC to perform past work.

The government responds that the ALJ made specific findings regarding the duties and exertional level of her past work as a property manager and, in fact, noted that while the job of property manager was typically performed at the light exertional level, Masterson performed it at the heavy level.[2] However, the government notes that the ALJ determined that–based on the medical evidence of record, Dr. Curtis's opinion, and the vocational expert's opinion–Masterson could perform the job of property manager at the "light" level.

The ALJ decided this case at step four of the five-step sequential evaluation. It is the claimant's burden to establish her RFC at step four. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003); *Pearsall v. Massanari*, 274 F.3d at 1217. RFC is defined as "the most [a claimant] can still do despite" his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related

---

[2] Masterson cites *Warner v. Heckler*, 722 F.2d 428 (8th Cir. 1983), for the proposition that a finding that a claimant could return to past work as it is performed in the national economy rather than how that claimant actually performed it is a finding that claimant could not return to past work. However, in *Lowe*, 226 F.3d at 973, we determined that "[w]here the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." As such, because Masterson's past work as a property manager is typically performed in the national economy at the "light" exertional level, and because the ALJ determined that the medical evidence indicates that Masterson's restrictions cause her to be limited to light or sedentary work, Masterson could return to her past employment as a property manager.

activities." S.S.R. 96-8p. When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. *Baldwin*, 349 F.3d at 556; *Pearsall*, 274 F.3d at 1217. The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. *Id.*

Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. *See* 20 C.F.R. § 404.1545(c); *Baldwin*, 349 F.3d at 556 (internal citations omitted).

In assessing Masterson's RFC, the ALJ particularly relied on Dr. Curtis's and Dr. McPeak's assessments of Masterson's limitations. The ALJ also noted that none of the records from treating physicians conflicted with these medical opinions. The ALJ relied on Dr. McPeak's determinations regarding Masterson's physical abilities, strength assessments, and joint movement and functioning. The ALJ further noted that Masterson takes only non-steroidal anti-inflammatory drugs for pain, and that while he believed that Masterson experienced pain, objective tests showed nothing more than mild to moderate impairments at best, and that no treating physician restricted her activities in any way. Finally, the ALJ noted that no physician diagnosed her with–and she was not treated for–a mental impairment.

-8-

The "relevant evidence" also included Masterson's own description of her pain and limitations, *see Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995), which the ALJ considered and found not to be fully credible. Masterson takes issue with the ALJ's discounting of her pain complaints; however, Masterson fails to show how the ALJ erred in that assessment. When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
> (2) the subjective evidence of the duration, frequency, and intensity of
> the claimant's pain;
> (3) any precipitating or aggravating factors;
> (4) the dosage, effectiveness and side effects of any medication; and
> (5) the claimant's functional restrictions.

*Baker v. Sec'y of Health & Human Services*, 955 F.2d 552, 555 (8th Cir. 1992); *Polaski*, 739 F.2d at 1322. Because pain, shortness of breath, weakness, or nervousness, for example, are difficult to measure, the ALJ may not disregard a claimant's subjective complaints of pain solely because the objective medical evidence does not fully support them. *Polaski*, 739 F.2d 1320. Rather, the absence of this evidence is just one of several factors used to evaluate the credibility of the testimony and complaints. The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts, but such assessments must be based upon substantial evidence. *Baldwin*, 349 F.3d at 558; *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Benskin*, 830 F.2d at 882. The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992); *Ricketts v. Sec'y of Health & Human Services*, 902 F.2d 661, 664 (8th Cir. 1990). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. *Id.* When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to

the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible. *Benskin,* 830 F.2d at 882.

The ALJ made specific findings under these requirements, noting: 1) that Masterson has a good work record; 2) her daily activities as noted in the opinion are inconsistent with the extreme complaints of pain; 3) she does not take any narcotic medication; 4) objective tests support only mild to moderate findings; 5) no treating or examining doctors restricted her daily activities. More significantly, the ALJ determined that while she did not find Masterson to be pain free, she also did not credit Masterson's complaints that extreme pain keeps her in bed and limits her activities to the degree Masterson claims. Our review of the record and hearing testimony indicates that substantial evidence supports the ALJ's determination that while Masterson experiences some pain and limitations, her pain complaints are inconsistent with the medical evidence of record and her own testimony concerning her daily activities. As such, we find that the ALJ properly determined Masterson's RFC.

B. *Investigation and Findings*

Masterson next argues that the ALJ failed to fully develop the record and make explicit findings regarding the physical and mental demands of Masterson's past relevant work before comparing her current abilities to that work. In addition, Masterson argues that the ALJ failed to establish through vocational evidence that she could perform work at the light exertional level.

As fully discussed above, our review indicates that the ALJ fully described Masterson's past work and properly compared that work to her current abilities before

determining that she could perform work at the light[3] exertional level. First, the ALJ summarized Masterson's testimony regarding her past work duties and credited this testimony by noting that Masterson "has a good work record" and performed her prior job as a property manager at the "heavy"[4] work level. The ALJ noted that Masterson presented medical records that indicate that she has some restrictions. However, Masterson failed to produce any records, particularly records involving her one-time diagnosis of fibromyalgia, that indicate that her restrictions severely limit her ability to function to such a degree that she cannot perform daily activities or that restrict her activities to preclude all work.

In addition, the ALJ relied on the vocational expert's testimony regarding the level of exertion (heavy) Masterson's past job required in developing the requirements of that job as performed by Masterson, and then as normally performed in the national economy (light). *See* 20 C.F.R. § 404.1566 (ALJ may use a vocational expert to

---

[3] 20 C.F.R. § 404.1567(b) provides:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[4] 20 C.F.R. § 404.1567(d) provides:

Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

assess the existence of work in the national economy). Masterson claims that the ALJ failed to determine the specific mental and physical requirements of her past job–however, the ALJ's reference to her past work being "heavy" work necessarily defined the parameters of the exertional level at which Masterson was working. *See* 20 C.F.R. § 404.1566 (ALJ may take judicial notice of job information in the Dictionary of Occupational Titles and other noted, reliable job information reports when assessing the existence of work in the national economy). As such, we find that the ALJ adequately developed the record regarding Masterson's physical and pain limitations and properly compared them to the requirements of her past relevant work as it is performed in the national economy. In doing so, we further find that the ALJ's decision is supported by substantial evidence, and we affirm.[5]

_____

[5] The ALJ also moved to step five in the sequential evaluation and determined that there were other jobs in the national economy that Masterson could perform. At that point, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. *Warner*, 722 F.2d at 431. However, because we agree that Masterson could perform her previous job as a property manager at the light exertional level, our analysis ends at step four of the sequential evaluation.