**Bettye J. McCRAY, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 3:04–CV–90011.**

United States District Court, S.D. Iowa, Davenport Division.

Aug. 11, 2004.

---

John A. Bowman, Davenport, IA (Thomas A. Krause, West Des Moines, IA, on the brief), for Plaintiff.

Gary L. Hayward, Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Bettye J. McCray, filed a Complaint in this Court on January 30, 2004, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Securi-

ty Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed an application for Social Security Disability benefits on May 16, 2001. Tr. at 45–47. Plaintiff claimed to have become disabled April 1, 2001. Tr. at 45. Plaintiff is insured for Title II benefits through December, 2005. Tr. at 54. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. The hearing was held April 30, 2003, before Administrative Law Judge Jean M. Ingrassia (ALJ). Tr. at 325–66. The ALJ issued a Notice Of Decision— Unfavorable on August 19, 2003. Tr. at 13–23. After the decision was affirmed by the Appeals Council on November 28, 2003, (Tr. at 7–11), Plaintiff filed a Complaint in this Court on January 30, 2004.

## MEDICAL AND VOCATIONAL HISTORY

Neurologist, M.A. Sanguino, M.D., saw Plaintiff on April 2, 2001. In a report to Plaintiff's primary care physician, G. Goettsch, D.O., Dr. Sanguino said that Plaintiff reported that about a month before, she began to experience difficulty with her hands feeling puffy and swollen. Eventually, Plaintiff's skin from the chest down became very sensitive to touch, and she developed numbness and tingling sensation and shooting pains in her lower extremities. Plaintiff also reported feeling weak. Tr. at 134. Dr. Sanguino ordered an MRI of Plaintiff's head. Tr. at 135. An MRI report, signed by Susan M. Bird, M.D., dated May, 2001, showed changes suggestive of a demyelinating process such as multiple sclerosis. Tr. at 131.

Plaintiff was admitted to Genesis Medical Center on May 5, 2001, and discharged on May 8, 2001. On discharge, the diagnoses were probable multiple sclerosis and intractable pain secondary to transverse myelitis. At discharge, Stephen C. Rasmus, M.D. wrote that Plaintiff's pain was partially controlled with medication. Tr. at 138.

Plaintiff saw Dr. Rasmus on May 15, 2001. Plaintiff continued to have back pain and trouble using her hands, but the pain was much better on the prescribed medication. The doctor wrote: "The pain is at least controlled enough that it is not incapacitating." Tr. at 179. Plaintiff saw Dr. Rasmus on May 30, 2001. Plaintiff had complained of fullness in her head and ear pain for which she was being treated by Dr. Goettsch. Dr. Rasmus noted that Plaintiff's left ear was swollen, red, and warm. He also noted that Plaintiff was relatively pain free, but was not concentrating very well. He discussed changes in Plaintiff's medication with Dr. Goettsch. Tr. at 175. Plaintiff went to the emergency room on June 9, 2001, because of the pain in her ears. She was prescribed Lortab for pain and advised about which over-the-counter medication to obtain for congestion. Tr. at 196. On June 25, 2001, Plaintiff saw Dr. Rasmus. Plaintiff complained of ear pain which the doctor was unable to explain. Plaintiff also noted some burning sensations in her calves and intermittent symptoms in the upper extremities. The doctor wrote: "The myelopathic pain is not as well controlled as I would like." Tr. at 225.

On July 27, 2001, Plaintiff saw Otolaryngologist Ralph R. Tyner, M.D. because of the "severe head pressure and ear pain and even upper neck pain." Tr. at 221. Dr. Tyner ordered an axial CT scan to see if the problem was caused by paranasal sinuses, or if it was a manifestation of the multiple sclerosis. Tr. at 222.

In a letter to Dr. Goettsch dated August 6, 2001, Dr. Rasmus wrote that Plaintiff had residual pain in her upper extremities as well as head fullness. Dr. Goettsch wrote: "At this time she would be unable to go back to work as a custodian, particularly in a heated environment. We talked about the possibility of looking into other occupations." Tr. at 220. On November 16, 2001, Dr. Rasmus wrote that Plaintiff would need to avoid environments with temperatures greater than eighty degrees. Tr. at 235. On October 11, 2001, when Plaintiff saw Dr. Rasmus, she said that she had heard the doctor's partner, John M. Wright, M.D., speak at a meeting and wanted him to be in charge of her care. Dr. Rasmus told her he would make the arrangements. In this report, Dr. Rasmus noted that Plaintiff had problems with severe fatigue in the afternoons which caused Plaintiff to lie down for up to an hour. Tr. at 237.

Dr. Rasmus wrote three notes releasing Plaintiff to work. On October 11, 2001, he wrote a note stating that Plaintiff could work 20 hours per week but that a warm environment would not be tolerated. He said that air conditioning would be required in the summer, and that she would need to avoid overheated rooms all year around. Tr. at 238. On November 7, 2001, the doctor wrote that Plaintiff could return to work on a full time basis. Tr. at 236. On November 16, 2001, Dr. Rasmus wrote that working in warm temperatures would exacerbate Plaintiff's symptoms of multiple sclerosis and he recommended that she not work in temperatures greater than eighty degrees. Tr. at 235.

Plaintiff was seen for an intake evaluation at Vera French Community Mental Health Center on January 4, 2002. Plaintiff was seen by Kay Stralow, LMSW. Plaintiff reported a four year history of anxiety following a traumatic event. Plaintiff reported that she had a hysterec-tomy following which she had complications of a pulmonary embolus. Plaintiff also reported being recently diagnosed with multiple sclerosis. Plaintiff had been on several types of medication, but none had been effective. Tr. at 240. On mental status exam, Plaintiff was noted to present herself in a depressed and tearful fashion. There was no evidence of psychotic thinking. Plaintiff said that she wished she were not alive but would not take her own life. Appointments were made for Plaintiff to see a nurse practitioner and a psychiatrist. Tr. at 242. Sridhar Yaratha, M.D. diagnosed panic disorder without agoraphobia, depressive disorder, and post traumatic stress disorder by history. Tr. at 250.

Plaintiff saw Dr. Wright on May 22, 2002, at which time he reviewed her history. Dr. Wright wrote that since Plaintiff's diagnosis of multiple sclerosis, pain had been a significant complaint with burning in the arms and legs as well as low back pain and chronic headache. The doctor wrote that these complaints were "quite debilitating." In addition, he wrote that Plaintiff had severe fatigue. Tr. at 256. Dr. Wright wrote that many of Plaintiff's symptoms were atypical for multiple sclerosis. He arranged for Plaintiff to be seen at the Mayo Clinic by a multiple sclerosis specialist. Tr. at 257.

On August 15, 2002, Istvan Pirko, M.D. wrote to Dr. Wright that Plaintiff had been seen at the Mayo Clinic. Dr. Pirko wrote that the final diagnoses were multiple sclerosis, laboratory evidence for systemic lupus with no end organ manifestations, and borderline elevated ACE level.

While at the Mayo Clinic, Plaintiff was seen in the department of psychiatry. Tr. at 280–81. At the conclusion of the mental status examination, the author of the report, who is only identified with the initials "MO", diagnosed an adjustment disorder

with anxious features. The author also said that a generalized anxiety disorder needed to ruled out, and that the author doubted the diagnosis of post traumatic stress disorder. Tr. at 281.

On October 10, 2002, Dr. Wright wrote that he had reviewed the results of the evaluation at the Mayo Clinic with Plaintiff. He said that the doctors at the Mayo Clinic had agreed with his diagnosis of multiple sclerosis "and agreed that her pain was not out of proportion to the usual cases of multiple sclerosis." He said that other explanations for Plaintiff's pain were not obtained. Tr. at 289.

Doctor Wright filled out a Medical Assessment Of Residual Functional Capacity on April 28, 2003. Tr. at 294–98. Dr. Wright opined that Plaintiff was able to lift a maximum of 10 pounds occasionally, and 5 pounds frequently. Tr. at 294. The doctor opined that Plaintiff is able to walk one hour at a time for a total of 3 hours in a work day. He said that Plaintiff's ability to sit was not affected by the illness. He said that Plaintiff would not need to lie down during the work day. He said that his opinion was based on the MRI of Plaintiff's brain which supported the diagnosis of multiple sclerosis. Tr. at 295. Dr. Wright opined that Plaintiff should never climb or balance, and only occasionally stoop, crouch, kneel, crawl, reach overhead. The doctor opined that Plaintiff could reach, see, hear, and speak. He said she could occasionally handle, push/pull, and bend forward and downward. He said that Plaintiff cannot do work involving feeling. Tr. at 296. Doctor Wright opined that Plaintiff could not use either her right or left upper extremities and hands for repetitive simple grasping, pushing & pulling, or fine manipulation. He said she could not use either of her lower extremities for repetitive movement such as operating foot controls. The doctor said Plaintiff should avoid heights, machinery, and

humidity. He said that temperature extremes were partially restricted. Tr. at 297. The doctor said that Plaintiff's medications cause drowsiness. He said that Plaintiff could not work either full time or part time. Tr. at 298.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing before the ALJ on April 30, 2003. Tr. at 325–66. Plaintiff, whose birth date is February 26, 1960, was 43 years old at the time of the hearing. Tr. at 329. Plaintiff said that being exposed to direct sunlight causes a burning feeling on her skin. She said: "It makes me feel like I'm standing next or close to a flame." She said that heat and humidity causes her to become fatigued and to have stabbing pains all over her body. Tr. 330.

Plaintiff testified that she had been seeing Dr. Wright for about a year. She said that she was at the Mayo Clinic for about a week during which time the doctors ran several tests. Tr. at 332. Plaintiff said that Dr. Rasmus wrote the letters releasing her to work at her request because she had a job which she did not want to give up. She said that the doctor advised against doing the job, but said she could try and see how she did. The doctor was correct, she could not continue the job. Tr. at 333. When asked why she cannot work, Plaintiff testified:

Mainly because I have the burning in my hands all the time. Every morning I wake up I feel like my hands are swollen twice the size that they are. But they're not swollen, it just feels like that. As soon as I start moving my fingers, I start getting the burning, the burning pain. And that is there all day. And it intensifies as I do more work. So sometimes I have to lay down and just leave my hands still. It could take an

hour, a couple hours, depending on how much pain I have.

Tr. at 334.

Plaintiff said that she becomes very nervous when she tries to read something and must use her fingers to follow the words. Tr. at 335.

Plaintiff testified that from January 1999 through April 2001, she worked as a custodian, cleaning office buildings. Between March 1995 through June 1998, she said that she worked for the Davenport Community Schools transporting children. She said that job came to an end when the school district fired all the bus drivers and contracted with a private company. Tr. at 336. Plaintiff said that from 1990 to 1993, she was a production worker at Oscar Mayer. Tr. at 337.

Plaintiff's husband testified that before the onset of the multiple sclerosis, his wife had been very energetic and active. Tr. at 340. He said that the doctors had told him not to expect any improvement in his wife's condition. Tr. at 341.

The ALJ called Paul From, M.D. to testify as a medical expert. Tr. at 341. Dr. From reviewed his analysis and assessment of the medical record which was before the ALJ. Tr. at 342–47. The doctor said there was no question that Plaintiff has multiple sclerosis, but that the condition is not of a severity to meet the listings set forth in the regulations. Tr. at 246. Dr. From testified that the restrictions identified by Dr. Wright on his residual functional capacity assessment were reasonable. Tr. at 350–52.

The ALJ called Brian Paprocki to testify as a vocational expert. Tr. at 359. The ALJ asked Plaintiff's counsel to begin the questioning of the vocational expert. When presented with a hypothetical question based on Dr. Wright's residual functional capacity assessment, the vocational expert testified that no competitive work would be possible. He said that Dr.

Wright had limited Plaintiff to sedentary work, and he could not think of any sedentary work that does not require the use of the hands for grasping, pushing, pulling, and the general use of the upper extremities. Tr. at 359. Thereafter, the ALJ asked the vocational expert to consider a 20 pound lifting restriction with a limitation of 10 pounds frequently, and the ability to sit, stand, and walk for a total of six hours in an eight hour work day. The ALJ indicated no restriction on pulling and pushing, and occasional balancing and crawling, no manipulative limitations, no visual or communicative limitations. The ALJ said that Plaintiff should avoid concentrated exposure to extreme cold and heat. In response, the vocational expert testified that some of Plaintiff's past work could be done under those restrictions. Tr. at 360–61.

## ADMINISTRATIVE DECISION

In the decision dated August 19, 2003, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time after the alleged onset of disability. At the second step, the ALJ found that Plaintiff's severe impairment is multiple sclerosis. At the third step, the ALJ found that Plaintiff's severe impairment is not of a severity to meet any listed in Appendix I, Subpart P, Regulations No. 4. Tr. at 26. At the Fourth step, the ALJ found that Plaintiff was able to do her past relevant work as a data entry person, production assembler or child monitor. In making this finding, the ALJ found that Plaintiff had the following residual functional capacity:

The claimant had the maximum residual functional capacity to lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk about 6 hours in an 8 hour workday; push and pull without limitation other

than as shown for lifting and carrying; occasional balancing and crawling; and must avoid concentrated exposure to extreme cold and heat. (20 CFR § 404.1545).

Tr. at 22. The decision of the ALJ was that Plaintiff was not disabled nor entitled to the benefits for which she applied. Tr. at 23.

## DISCUSSION

 The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

 In the case before the Court, the ALJ found that Plaintiff is able to do her past relevant work. That finding, is based on the finding that Plaintiff has the residual functional capacity for work as outlined in the residual functional capacity finding and the hypothetical put to the vocational expert by the ALJ at the administrative hearing. The Court of Appeals for the Eighth Circuit has held numerous times that although a residual functional capacity finding is based on all the evidence in the record, it is a medical question and must be supported by some medical evidence. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir.2002), and cases cited therein. Judge Richard Arnold wrote in *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), that the most important issue in a disability case is the question of residual functional capacity. Residual functional capacity, wrote Judge Arnold, "... is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Id.See also, Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). It is Plaintiff's burden to produce the evidence of his or her residual functional capacity. *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir.2004). In *Masterson,* the Court wrote:

The RFC "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work related activities." S.S.R. 96–8p. When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. *Baldwin,* 349 F.3d at 556; *Pearsall,* 274 F.3d at 1217. The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.

*Id.* The Court, 363 F.3d at 737–38, went on to quote several other Eighth Circuit cases which state that although RFC is determined based on all relevant medical evidence, it is a medical question and must be supported by some medical evidence. Furthermore, the ALJ should give more weight to the opinion of the treating physicians because they have a longitudinal picture of the impairment and its effect on their patient. *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir.2004).

In the case at bar, the evidence is clear that Plaintiff suffers from multiple sclerosis [1]. The diagnosis is supported by MRI examinations, and by other tests such as an analysis of Plaintiff's spinal fluid. In addition, in an effort to learn how to treat Plaintiff's other symptoms, her local treating neurologist sent her to the Mayo Clinic where the possibility of other illnesses was raised. The only doctor to give a detailed opinion on Plaintiff's residual functional capacity is Dr. Wright. Dr. Wright provided this evidence on a residual functional capacity form provided to him by Plaintiff's counsel. Dr. From, who testified as a medical expert, said that he would not disagree with Dr. Wright's opinion. He further said that he would defer to Dr. Wright's assessment because Dr. Wright is the treating physician. In response to a hypothetical based on Dr. Wright's assessment, the vocational expert testified that no work would be possible.

The Court has searched the record but can find no substantial medical evidence to support a finding that Plaintiff has a residual functional capacity consistent with that found by the ALJ. Although Dr. Rasmus wrote three very short notes releasing Plaintiff to return to work, Plaintiff testified that they were written at her request against Dr. Rasmus' better judgment. She further testified that as the doctor had predicted, she was not able to work either at a full time schedule or a reduced schedule of 20 hours per week. Although this is some evidence which supports the ALJ's finding, it is not enough to say that her decision is supported by substantial evidence on the record as a whole. *See Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) explaining that the review of an administrative decision is more that than a search for some evidence which supports the decision.

■ The vocational expert testified that he could find no work at which a person, limited to sedentary exertion but not able to use their upper extremities, could function. The limitation on use of the upper extremities is supported by more than Dr. Wright's residual functional capacity assessment. It is also supported by Plaintiff's testimony that her hands often feel swollen, and that she must often let them rest in order to have any use at all. At nearly every medical examination, the doctors noted Plaintiff's complaints of inability

1. Multiple sclerosis is an autoimmune disorder in which the insulating sheath surrounding nerve fibers is destroyed and replaced by scar tissue, causing nerve communication to be disrupted. Symptoms, which vary widely from person to person and from stage to stage of the disease, include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control. Most often the disease remits and relapses, but it may progress without remissions or with periodic plateaus or minimal improvements. No single test confirms a diagnosis, but magnetic resonance imaging can reveal the areas of scar tissue. *Young v. Apfel,* 221 F.3d 1065, 1067 n. 3 (8th Cir.2000), citing Sloane–Dorland Annotated Medical–Legal Dictionary 632–33 (1987), supp. At 470–71 (1992). In *Young,* during the period of time the claimant needed to prove her disability, MRI reports showed no evidence of multiple sclerosis, medical reports showed essentially normal neurological status, and no physician opined that Young was unable to perform any type of work.

to use her arms and hands, as well as pain in other parts of her body such as her low back and legs. Consistent complaints of pain is objective evidence in support thereof. *Brosnahan v. Barnhart,* 336 F.3d 671, 678 (8th Cir.2003) holding, among other things, that objective medical evidence included consistent complaints of pain during relatively frequent physicians' visits. Other than Dr. Rasmus' cursory notes stating that Plaintiff could return to work, the Court can find no medical evidence in this record that Plaintiff retains the ability to do either her past work or any other work in the national economy.

] In *Gavin v. Heckler,* 811 F.2d at 1201, Judge Lay wrote:

> Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

This is the situation in the case at bar. The record is fully developed with medical evidence and vocational expert testimony. Substantial evidence on the record as a whole supports only one conclusion, Plaintiff is disabled and entitled to the benefits for which she applied. A remand to take additional evidence would serve no useful purpose and would only delay the receipt of benefits to which Plaintiff is clearly entitled.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled. This case, therefore, is hereby remanded for the sole purpose of computing and awarding Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b) [2].

IT IS SO ORDERED.

---

2. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."