**John V. GOETZ, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. A1–04–89.

United States District Court, D. North Dakota, Southwestern Division.

March 31, 2005.

Edwin W.F. Dyer, III, Dyer & Summers, Bismarck, ND, for Plaintiff.

Lynn C. Jordheim, Jennifer Klemetsrud Puhl, U.S. Attorney's Office, Fargo, ND, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

The plaintiff, John V. Goetz, seeks judicial review of the Social Security Commis-

sioner's denial of his application for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401–433. For the reasons set forth below, the Defendant's Motion for Summary Judgment is granted and the Plaintiff's Motion for Summary Judgment is denied.

## I. PROCEDURAL HISTORY

The plaintiff, John V. Goetz, applied for disability insurance benefits (DIB) on January 13, 2003, alleging that he had been disabled since June 15, 2001, due to an obsessive compulsive disorder, a broken pelvic bone, and two broken bones in his back.[1] Goetz's application for benefits was denied initially on February 3, 2003, and again upon reconsideration on April 2, 2003. He subsequently requested a hearing before an administrative law judge (ALJ). On August 29, 2003, a hearing before the ALJ was held in Bismarck, North Dakota. The ALJ issued a decision on February 20, 2004, wherein he concluded that Goetz was not disabled within the meaning of the Act. On May 15, 2004, the Appeals Council denied Goetz's request for review, and the ALJ's decision became the final decision of the Commissioner. Goetz then filed a complaint with this Court on July 2, 2004, seeking judicial review of the Commissioner's decision under Section 205(g) of the Act, 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

John Goetz was born May 8, 1968, and was 35 years old on the date of the Commissioner's final decision. (Tr. 69). He has a high school education plus three additional years of training as a power plant technician. (TR. 85). He has past work experience as a refinery laborer, a farm laborer, a construction laborer, and a retail sales clerk. (Tr. 80). Goetz applied for DIB in January 2003, alleging an inability to work since June 2001, due to an obsessive compulsive disorder, a pelvic fracture, and two broken bones in his back. (Tr. 69–71, 93)

Goetz has a long history of an obsessive compulsive disorder. (Tr. 234). Since 1999 Elsa M. Remer, M.D. has been his treating physician with regard to this disorder. (Tr. 309). The record contains treatment notes from Dr. Remer spanning from June of 2000 until July of 2003. Goetz's disorder involves obsessive thoughts of pornography, obscenities, and sexual thoughts about God, Jesus, the Devil and Mary. (Tr. 309, 420). He does not exhibit any compulsive behavior. (Tr. 199).The treatment notes from the period prior to the alleged onset date show that Goetz was struggling with his disorder, drinking heavily, and working on his parent's farm. (Tr. 215–237). At a meeting with Dr. Remer on July 3, 2001, Goetz reported drinking problems which had lead to a charge of actual physical control of a vehicle and having quit his job after three days. (Tr. 213).Dr. Remer saw Goetz on July 25, 2001, at which time it was noted he had a rough month but that he was now off all medications except for ambien. (Tr. 212). On August 8, 2001, Goetz stated the last two weeks had been rough, but he had started a new job with a pipeline company. (Tr. 209). On August 22, 2001, it was noted Goetz was praying a lot and looking for a job. (Tr. 208).

Records from the St. Louis Behavioral Medicine Institute, St. Louis, Missouri, between November 20, 2001, and February 7, 2002, reveal inpatient treatment for obses-

---

1. Goetz filed a previous application for DIB on July 18, 2002, with a protective filing date of June 26, 2002, and an alleged onset date of June 15, 2001. This application was denied by the Commissioner upon initial consideration. Goetz did not seek review of this decision and it is not now before the Court.

sive compulsive disorder. (Tr. 337–369). During this period, Goetz reported improvement with treatment. (Tr. 341, 346–347, 349–350, 352, 353–354,361,365). He also reported attending a hockey game and church services. (Tr. 354, 365). He denied alcohol consumption. (Tr. 352, 354, 360, 362, 365.367). It was concluded that Goetz was able to engage in high level exposure and response prevention, follow an alcohol abuse safety plan, and maintain gains during treatment despite a three-week interruption of treatment. (Tr. 338).

After going through inpatient treatment in St. Louis, it was noted by Dr. Remer on February 13, 2002, that Goetz did not require any reassurance about his thinking and had not requested any reassurance which is a major improvement. (Tr. 205). Goetz was next seen on May 3, 2002, at which time it was noted he had no depressive symptoms or compulsions, his memory was fairly intact, and his judgment and insight were limited. (Tr. 205). On May 10, 2002, his insight and judgment were fair. (Tr. 202). On May 17, 2002, Goetz offered that he would like to start looking for work. (Tr. 199). He was next seen on June 28, 2002, at which time he related that he wanted to move to Bismarck and find a job but that he did not feel ready for the physical aspects of a job. (Tr. 195). Judgment and insight were improving except with regard to alcohol use. (Tr. 196). On July 5, 2002, Goetz reported he was doing much better and wanted to secure a power plant job. (Tr. 193). His drinking was stable and moderate. (Tr. 193). Dr. Remer noted his judgment, insight, and mood were improving and that he did not require as much assurance. (Tr. 193). His judgment and insight continued to slowly improve through August of 2002. (Tr. 192, 287). On August 26, 2002, Goetz reported he was the best he had ever been and he had moved into his own apartment in Bismarck. (Tr. 284). Another follow up visit was made on October 4, 2002,

during which Goetz relayed that he had been well enough to travel to Seattle for a hair transplant. (Tr. 282). The obsessive compulsive disorder was about the same, he was looking for work at a gasification plant, and had a job interview scheduled for October 30th in Madison, Wisconsin. (Tr. 282). Judgment and insight continued to improve. (Tr. 283). At his next visit on November 18, 2002, it was noted that Goetz was able to talk himself through his disorder and that his judgment and insight were fairly good. (Tr. 280). On December 2, 2002, Goetz reported having gone hunting over Thanksgiving and enjoying himself. (Tr. 278). He was having no problems with alcohol and was working to get a job at a power plant and it was noted this was a positive move for him. (Tr. 278). At a followup on December 17, 2002, he stated he continued to gain insight into his disorder and had applied for some jobs. (Tr. 276). His judgment and insight were good. (Tr. 276).

Dr. Remer saw Goetz on February 14, 2003 and described him as having done a great deal of work and was attending a special program in St. Louis, Missouri with wonderful results. (Tr. 309). Dr. Remer noted medication had not been very helpful but that Goetz realized he was capable of putting his thoughts in their place and not become overwhelmed by it. (Tr. 309). Dr. Remer noted that Goetz continued to work part-time at a power plant and there was a possibility of full-time employment. (Tr. 309). Goetz was excited about the possibility of full time employment. (Tr. 309). He was living on his own and had quit abusing alcohol. (Tr. 309). The obsessive compulsive disorder was not causing any problems and Goetz had been receiving excellent comments at work. (Tr. 309). He was taking his medications without difficulty. (Tr. 309). Goetz was appropriately dressed and groomed, had good eye contact, a normal rate of speech

and volume. (Tr. 309). His mood was engaging and cooperative. (Tr. 309). He exhibited no psychoses, and his disorder had lessened. (Tr. 309). His memory, judgment and insight were good. (Tr. 309). He had no suicidal or homicidal thoughts and was invested in his therapy. (Tr. 309). Obsessive compulsive disorder, alcohol dependency and depressive disorder NOS were diagnosed. (Tr. 309). The medications seroquel,[2] paxil,[3] and ambien[4] were continued.

Dr. Remer next saw Goetz on April 11, 2003. She noted Goetz was able to talk himself through his obsessive compulsive disorder thoughts. (Tr. 376). He was working, enjoying it and finding it helpful. (Tr. 376). His condition was improving and he was living on his own. (Tr. 376). At his next office visit on May 8, 2003, the disorder was found to be fairly stable. (Tr. 374). It was noted Goetz enjoyed renting movies, driving and was planning to file for bankruptcy. (Tr. 374). He continued to work and enjoyed work. (Tr. 374).

On June 6, 2003, Goetz again saw Dr. Remer. He told Dr. Remer his work at the power plant was going well. (Tr. 372). He was doing an excellent job with self talk and working with his obsessive thoughts. (Tr. 372). His thoughts are constant but he realizes that they are just thoughts and is able to let them go. (Tr. 372). He rarely drinks alcoholic beverages. (Tr. 372). The alcohol dependency diagnosis previously made was determined to be incorrect. (Tr. 372).

The most recent treatment notes in the record from Dr. Remer are from July 25, 2003. (Tr. 309). Goetz relayed that he was doing quite well at work. (Tr. 370).

His obsessive compulsive disorder was about the same. (Tr. 370). The depression did not seem to be a problem, and Goetz's brother was giving him support. (Tr. 370). Moving away from home and being independent had boosted his self confidence. (Tr. 370). He felt comfortable with his disorder and knew that the thoughts would pass. (Tr. 370). Goetz was appropriately dressed and groomed, relaxed, and comfortable with no rapid speech and a pleasant and engaging affect. (Tr. 370). His insight and judgment were good and he had no suicidal or homicidal thoughts. (Tr. 371).

Dr. Remer completed a Medical Assessment of Ability to do Work–Related Activities (Mental) form regarding Goetz on August 15, 2003. The assessment covered the time frame from July 1, 2000 to December 19, 2002. Dr. Remer rated his ability to do work related activities as poor to non-existent in every category except carrying out simple instructions and maintaining personal appearance. (Tr. 380–81). Dr. Remer also completed a mental residual functional capacity assessment on August 15, 2003. She found Goetz moderately limited in seven categories and markedly limited in thirteen categories. (Tr. 382–83). This assessment was limited to the July 1, 2000, to December 19, 2002, time frame.

A mental residual functional capacity evaluation completed by a medical consultant on March 28, 2003, found Goetz was moderately limited in five areas and not significantly limited in fifteen areas. (Tr. 311–12). He was determined to have no restriction of activities of daily living, mild difficulties in maintaining social function-

---

**2.** An anti-psychotic medication. *Physicians Desk Reference,* 662 (59th ed.2005).

**3.** An antidepressive medication. *Physicians Desk Reference,* 1585 (59th ed.2005).

**4.** A sleep aid. *Physicians Desk Reference,* 2980 (59th ed.2005)

ing and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 325).

Goetz was hospitalized between March 14–20, 2002, following a motor vehicle accident during which he rolled the vehicle he was driving. (Tr. 145–1 48, 162, 240, 273–275). He admitted to alcohol consumption at the time of his motor vehicle accident. (Tr. 163, 273). Goetz had a blood alcohol concentration of .23 at the time of the accident but no charges were brought, and his family had him involuntarily committed for a chemical dependency evaluation. (Tr. 201). Pelvic x-rays revealed probable acetabulum (the large cup-shaped cavity on the lateral surface of the hip bone in which the head of the femur articulates) fractures. (Tr. 145, 154, 180). Pelvic/abdominal computerized tomography (CT) scans revealed multiple lumbar spine fractures and an acetabuluni fracture. (Tr. 163, 185–186). Lumbar spine x-rays revealed fractures with intact vertebral bodies and preserved disc spaces. (Tr. 163, 181). A thoracic spine CT scan revealed no fracture of other body abnormalities. (Tr. 163, 182). Cervical spine x-rays were normal. (Tr. 152, 184, 187).

Records of the Bone & Joint Center, Bismarck, North Dakota, including those of Charles P. Dahl, M.D., between June 26, and December 30, 2002, reveal treatment for lumbar spine and pelvic fractures. (Tr. 239–242, 244, 289). A physical examination on June 26, 2002, revealed normal lumbar spine ranges of motion, negative straight leg raise testing bilaterally, normal lower extremity muscle strength, normal reflexes bilaterally, painful but normal hip ranges of motion, the absence of left knee swelling, and full left knee ranges of motion. (Tr. 241). Goetz denied knee instability. (Tr. 240). Lumbar spine x-rays revealed fractures with good disc space height with "some mild" foraminal stenosis. (Tr. 244). A lumbar spine magnetic resonance imaging (MRI) revealed normal vertebral body height and alignment; preserved interspaces; and the absence of disc protrusion, spinal or foraminal stenosis, or fractures. (Tr. 243). Left hip x-rays confirmed an acetabular fracture. (Tr. 244). Knee x-rays revealed excellent joint space and only mild lateral patellar tracking. (Tr. 244).

Goetz rated his lower back, left thigh, and anterior knee pain as a nine or 10 (presumably on a scale of one to ten, ten being worst). (Tr. 240). Goetz reported that he remained sober. (Tr. 240). He was taking no pain medications. (Tr. 240). An examination on July 25, 2002, revealed painful ranges of motion, but also negative straight leg raise testing, and good hip range of motion. (Tr. 239, 240). Goetz reported continuing left side, thigh, and groin pain but "feeling dramatically better." He denied experiencing any back pain, and reported walking two to three miles at a time without significant discomfort. (Tr. 239).

Goetz's hip fracture healed satisfactorily for function. (Tr. 240). It was concluded that Goetz was improving and that he was restricted from excessive heavy lifting, but could return to lighter, moderate work activity. (Tr. 239, 240). On December 30, 2002, Dr. Dahl stated Goetz could return to work activity without restrictions. (Tr. 289).

On September 17, 2002, Dr. Johnson, a State agency physician, concluded that Goetz retained the physical residual functional capacity to lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit six hours in an eight-hour workday; push and/or pull within his lifting capacity; and climb, balance, stoop, kneel, crouch, and crawl frequently; and that he had 110 manipulative, visual, communicative, or environmental limitations. (Tr.246–249). A physical re-

sidual functional capacity evaluation was completed by a medical consultant on March 31, 2003. (Tr. 329). This evaluation found Goetz could lift fifty pounds occasionally, twenty five pounds frequently, and stand or sit for six hours in an eight hour day with no limits on pushing or pulling. (Tr. 330). No postural, manipulative, visual, communicative or environmental limitations were noted. (Tr. 333).

At the hearing before the ALJ on August 29, 2003, Goetz testified that he resided alone. (Tr. 418). He stated he experienced an obsessive compulsive disorder which was improved with medication and treatment in St. Louis, Missouri, and he no longer had compulsions. (Tr. 420–422, 424, 426). Goetz testified his disorder was worsening a bit lately. (Tr. 419). He also testified that he experienced depression, which had improved. (Tr. 422, 426–427). Goetz was drinking little in the way of alcoholic beverages. (Tr. 423, 429). Goetz stated he had sustained back and pelvic injuries in a motor vehicle accident in March 2002, resulting in difficulty bending, difficulty lifting more than 50 pounds occasionally, and left leg pain which was "not so bad," and he had "learned to live with pain pretty good." (Tr.423–424, 428).

Goetz testified that he cared for his own personal needs (Tr. 424), performed limited household cleaning and other chores (Tr. 424–425), prepared simple meals (Tr. 425), possessed a driver's license, shopped, visited others occasionally, rented and watched movies, and hunted and planned to continue to do so. (Tr. 418, 425, 426, 428). He also worked part-time. (Tr. 418, 425, 428–429). Goetz returned to work as a laborer at Great River Energy on January 6, 2003, at an hourly rate of $13. (Tr. 103). His work is part-time, one week per month, eight hours per day. (Tr. 133).

Warren Haagenson, a vocational expert, testified that, considering an individual of Goetz's age, education and past relevant work experience with an RFC to perform light work[5] reduced by limitations from more than occasional bending, squatting, kneeling, crawling, and climbing; any operation of hand or leg controls, and any complex tasks, and to no more than simple, rote, repetitive work, jobs existed in the regional and national economies which such an individual could perform. (Tr. 430–431). He cited amusement/recreation attendant, rental counter clerk, and small parts and bench assembler as examples, and provided the incidence of these jobs in the regional and national economies. (Tr. 431).

### III. ALJ'S DECISION

After considering all of the evidence, the ALJ found in his decision of February 20, 2004, that Goetz had "severe" obsessive compulsive disorder and anxiety and affective disorders, and status post lumbar spine and pelvic fractures, but that he did not have an impairment or a combination of impairments listed in or medically equal to one listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 22). The ALJ found that Goetz's subjective complaints were not fully credible. (Tr. 22). He further found that Goetz retained the residual functional capacity to perform light work limited to simple, routine, repetitive work activities with no operation of foot controls or performance of complex tasks. (Tr. 22). The ALJ determined that, although Goetz could not perform his past relevant work, in light of the vocational expert's testimony and other evidence of record, there were a significant number of jobs in the national economy Goetz could perform. (Tr. 22).

---

**5.** Light work involves sitting two hours and walking and standing six hours in an eight-hour workday, and lifting no more than 20 pounds at a time. See 20 C.F.R. § 404.1567(b) (2004); Social Security Ruling (S.S.R.) 83–10.

## IV. STANDARD OF REVIEW

■ The Court plays a limited role when reviewing the Commissioner's decisions. *Wiseman v. Sullivan*, 905 F.2d 1153, 1155 (8th Cir.1990). The Court does not conduct a de novo review. *Keller v. Shalala*, 26 F.3d 856, 858 (8th Cir.1994). Rather, it looks at the record as a whole to determine whether the decision is supported by substantial evidence. Upon review of the pleadings and transcript of the record, the Court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the Court must find that it is supported by substantial evidence appearing in the record as a whole. *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992). The review of the record is more than a search for evidence supporting the Commissioner's decision. The Court must also take into account matters that detract from the ALJ's findings and apply a balancing test to weigh evidence which is contradictory. *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir.1991); *Sobania v. Secretary of Health & Human Services*, 879 F.2d 441, 444 (8th Cir.1989).

When conducting its review, the Court employs a "scrutinizing analysis" that balances the supporting and contradictory evidence on the record. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987). As noted, this requires more than a search for evidence that supports the Commissioner's decision. The Court must review the entire record and weigh all evidence that fairly detracts from the Commissioner's findings. *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989).

■ In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider:

1) the credibility findings made by the ALJ;

2) the plaintiff's vocational factors;

3) medical evidence from treating and consulting physicians;

4) the plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5) any corroboration by third parties of the plaintiff's impairments; and

6) the testimony of vocational experts that is based upon a proper hypothetical questions setting forth the plaintiff's impairment.

*Baker v. Secretary of Health and Human Services*, 955 F.2d 552, 555 (8th Cir.1992).

■ The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994). In other words, while the Court may weigh evidence differently, it cannot reverse a Commissioner's decision if there is sufficient evidence to support either outcome. Id.

## V. LEGAL DISCUSSION

Goetz's primary argument is that the ALJ improperly disregarded the opinion of his treating physician, Dr. Remer, who rated his ability to do work-related activities between July 31, 2000, and December 19, 2002, as very limited. A disability onset date of June 15, 2001, has been alleged. Goetz does not contend that he was disabled after December 2002 or early 2003. The record clearly supports the conclusion that Goetz was capable of work-

ing by January 6, 2003, when he obtained part-time employment as a laborer working one 40–hour week per month. (Tr. 103, 133). As such, the Court will direct its attention to the time period running from the alleged onset date of June 15, 2001 through the end of 2002. The Act requires a finding of period of disability of at least one year in duration before benefits may be awarded. 42 U.S.C. § 423(d)(1)(A).

■■■ A treating physician's opinion should be granted substantial or controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Prosch v. Apfel,* 201 F.3d 1010, 1014 (8th Cir.2000). The ALJ in this case discounted the opinions of Dr. Remer.

Dr. Remer's findings as to Goetz's ability to perform work-related activities encompasses a 2½ year period during which his condition was consistently described as improving. (Tr. 193 196, 205, 283). In addition, this opinion was given eight months after the period of time it contemplates, and includes a one year period of time preceding the alleged onset date. The Court finds Dr. Remer's contemporaneous treatment notes to be more persuasive than her August 15, 2003, opinion.

It is notable that throughout all of Dr. Remer's treatment notes she placed no restrictions on Goetz obtaining employment and did not discourage him from seeking employment. Goetz consistently expressed a desire to work and actively sought employment. (Tr. 193, 195, 199, 208, 209, 278, 282). In fact, prior to the alleged onset date he was able to work on his parent's farm. (Tr. 229). Dr. Remer consistently described his condition as improving. (Tr. 192, 193, 196, 283, 287). After his return from treatment in St. Louis he was described as having undergone a major improvement. (Tr. 205). During

this period Goetz was able to move into his own apartment in Bismarck, (Tr. 284), travel to Seattle for a hair transplant, (Tr. 282), apply for jobs and go to job interviews, (Tr. 276, 282), and go hunting. (Tr. 278). In August of 2002, Goetz described himself as the best he had ever been. (Tr. 284). His earnings history shows substantial earnings through the year 2000. (Tr. 72–73).

Based upon the lack contemporaneous clinical findings to support Dr. Remer's later opinion about Goetz's ability to do work-related activities, the Court cannot conclude that the ALJ improperly discounted the conclusions of Dr. Remer.

■■■ With respect to Goetz's physical problems, such problems were caused by a motor vehicle accident which occurred on March 14, 2002, and required hospitalization. (Tr. 145). Goetz sustained a cracked pelvis and two broken bones in his back. (Tr. 239–42). He was released to light work by the end of July 2002, and released with no restrictions on December 30, 2002. (Tr. 240, 289). Thus, as far as Goetz's physical problems are concerned, he would have been incapable working for approximately 4½ months or from mid-March 2002 until the end of July 2002.

This is one of those cases which falls within a zone of choice wherein reasonable minds may disagree. See *Clarke v. Bowen,* 843 F.2d 271, 272–73 (8th Cir.1988). It is well-established that where the evidence can support either outcome, the Commissioner's decision must be upheld. *Rautio v. Bowen,* 862 F.2d 176, 179 (8th Cir.1988). Both parties have made reasonable arguments in support of their respective positions and evaluation of the evidence. However, the substantial evidence standard is quite deferential and is something less than even a preponderance of the evidence standard. *Masterson v. Barnhart,* 363 F.3d 731, 736 (8th Cir.2004). It is not

the province of the Court to substitute its judgment for that of the ALJ. The Commissioner's decision is supported by substantial evidence appearing in the record as a whole.

## VI. CONCLUSION

In summary, the Courts finds the opinion of the ALJ is supported by substantial evidence in the record as a whole. The Court DENIES Goetz's Motion for Summary Judgment (Docket No. 13) and GRANTS the Commissioner's Motion for Summary Judgment (Docket No. 11). The decision of the Commissioner is affirmed.

IT IS SO ORDERED.