**Retha Mae STALKUP, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:08–cv–302 RP–CFB.**

United States District Court,
S.D. Iowa,
Central Division.

Aug. 19, 2009.

Christopher D. Hagen, U.S. Attorney's Office, Des Moines, IA, for Defendant.

Thomas A. Krause, West Des Moines, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Retha Mae Stalkup, filed a Complaint in this Court on August 3, 2008, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

■ Plaintiff filed applications for benefits on July 22, 2004. Tr. at 67–70 & 416–19. The ALJ noted that Plaintiff had previously filed applications for benefits which were denied after an initial determination on October 27, 2003. Tr. at 16. The ALJ declined to reopen the earlier determination. Tr. at 17. This Court is without

jurisdiction to review that part of the decision. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977).

Plaintiff, whose date of birth is June 1, 1949 (Tr. at 67), was 57 years old at the time of the hearing on March 9, 2006. Tr. at 439. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. The hearing was held before Administrative Law Judge John P. Johnson (ALJ). Tr. at 434–94. The ALJ issued a Notice Of Decision— Unfavorable on August 24, 2006. Tr. at 14–23. The Appeals Council declined to review the ALJ's decision on June 25, 2008. Tr. at 8–12. Thereafter, Plaintiff commenced this action.

Plaintiff was last insured to receive Title II benefits at the end of June 2007. Tr. at 71. In her application for Title II benefits, Plaintiff said she became unable to work February 14, 2003. Tr. at 89. The ALJ proceeded through the steps of the sequential evaluation, finding that Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. He found that Plaintiff has severe impairments consisting of "coronary artery disease status post percutaneous transluminal coronary angioplasty, peripheral vascular disease status post two catheter intervention, obesity, migraines and degenerative changes of the lumbar spine." The ALJ found that none of these impairments, alone or in combination, meets or equals any found in the listing of impairments. The ALJ found that Plaintiff retains

> the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit, stand, and walk for six hours. The claimant can stoop, squat, kneel, crawl, and climb only occasionally. She cannot be exposed to excessive heat, cold, humidity, dust, fumes or smoke. She must avoid heights and moving machinery.

Tr. at 21. The ALJ found that Plaintiff is able to return to her past relevant work as a waitress, cashier, desk clerk, taxi dispatcher, and day care worker. Tr. at 22–23. The ALJ held that Plaintiff is not disabled and not entitled to the benefits for which she applied. Tr. at 23.

## MEDICAL EVIDENCE

On February 5, 2003, Plaintiff saw her family physician at a Mercy Clinic, complaining of pain in her left hip area after she had slipped and bumped into a door jam. Plaintiff described moderately severe sharp burning pain. The diagnosis was sciatica for which a prescription was written and Plaintiff was advised to rest and use heat, and to return to the clinic in two days. Tr. at 274. On February 7, 2003, Plaintiff's pain had improved a little, but straight leg raising was positive on the left. The doctor wrote that if improvement did not continue, Plaintiff would be referred for an MRI. Tr. at 273. On February 11, 2003, Plaintiff underwent an MRI of the lumbar spine requested by Jerry McCauley, D.O., because of left buttock pain with radiation to the left leg. The study showed degenerative changes at the L3–4 level and the L5–S1 level which was described as very mild bilateral facet osteoarthritic change. Tr. at 161. On February 18, 2003, when Plaintiff was seen again at the Mercy Clinic, her left hip and leg pain was noted to be "much improved." Tr. at 272.

On February 13, 2003, Plaintiff saw Jose Angel, Jr., M.D., at Mercy Hospital Medical Center in Des Moines, Iowa. Plaintiff had developed acute chest pain, left arm pain and epigastric pain with diaphoresis. Her husband took her to the Emergency room. Her distress was relieved with nitroglycerin paste and a GI cocktail. Plain-

tiff reported a history of treatment for peripheral vascular disease with treatment at the University of Iowa. She also reported a 30 year history of smoking a pack of cigarettes each day. Tr. at 157. After a physical examination, Dr. Angel opined that Plaintiff's chest pain was atypical for cardiac disease but he recommended a Cardiolite scan and if it was positive, consideration of an angiogram. If the Cardiolite scan was negative, then a GI work-up would be considered. The doctor recommended strongly that Plaintiff stop smoking. Tr. at 158. A stress test on February 14, 2003, was suspicious for ischemia. Tr. at 159.

On February 19, 2003, Plaintiff was seen by Craig A. Stevens, M.D., of Iowa Heart Center. Plaintiff came to Dr. Stevens' office after having had chest pain radiating into her arms with shortness of breath and weakness for about 8 hours. The doctor noted "quite a bit of anxiety." Tr. at 241. On review of systems, the doctor noted Plaintiff was positive for symptoms of fatigue intermittently over the past month. On physical examination bilateral mastectomies were noted. While she was in the doctor's office, she was given oxygen, nitro paste, aspirin, and Plavix in order to relieve her chest pain. The doctor said he was going to admit Plaintiff to the hospital to care for her further. Tr. at 242.

Plaintiff was admitted to Mercy Hospital on February 19, 2003 and discharged on February 21. Tr. at 184. She under went coronary angiography and angioplasty on February 20, 2003. Tr. at 190. See also Tr. at 194–95 report of the angiography and angioplasty.

Plaintiff saw Dr. Stevens and Craig J. Hoffman, PA–C on March 21, 2003. Plaintiff denied chest pain or other symptoms. She stated that she continued to smoke, although she had reduced the number of cigarettes. Tr. at 239. After a physical examination, Plaintiff was described as a 53–year–old woman with a known history of coronary artery disease which appeared to be stable following angioplasty. She was counseled to stop smoking. Tr. at 240.

A History and Physical dated May 13, 2003, states that the day before (see Tr. at 237–38), Plaintiff had presented with complaints of chest tightness and atypical discomfort. A Cardiolite stress test was ordered and it showed basolateral wall ischemia. Given those results, Plaintiff was admitted to Mercy Hospital for observation and repeat angiography. Tr. at 207. The discharge summary dated May 16, 2003, states that two sites were stented. Tr. at 205.

On September 22, 2003, Plaintiff was seen at Iowa Heart Center by Craig A. Stevens, M.D. Plaintiff's attempts to stop smoking were, thus far, a failure. That day, Plaintiff underwent a adenosine Cardiolite stress test. Plaintiff reported symptoms of left hip claudication after walking about a block. Tr. at 234. After his examination, Dr. Stevens' impression was that Plaintiff had left common iliac stenosis, arteriosclerotic heart disease, nicotine abuse for which she was counseled to stop, a history of hypertension, history of hyperlipidemia, and bronchospasm. He arranged for Plaintiff to undergo iliac angiogram. Tr. at 235.

Plaintiff underwent peripheral angiography on October 8, 2003. The study revealed a 70% stenosis of the left common iliac artery. Atul Chawla, M.D., opened the lesion by inflating a Viatrac balloon. "The entire lesion was inside the previously-placed stent and hence, was not stented again." The doctor wrote that if restenosis reoccurred, repeat stenting would be considered. On discharge, Plaintiff was told not to lift more than 10 pounds for one week, and to walk 30 minutes twice each

day and to increase that as tolerated. Tr. at 259.

A treatment note from the Mercy Hill Top Clinic dated May 12, 2004, states that Plaintiff was still having back pain off and on. Plaintiff said that the back pain went down the left leg to the knee, and that she felt as though her foot was dragging. On physical examination straight leg raising was positive at 30 degrees. She walked on heels and toes adequately. Under the heading Plan, the doctor wrote "MRI to [reconsider] nerve compression & disc disease." Plaintiff was given samples of Celebrex. Tr. at 270.

On July 12, 2004, Plaintiff was seen at the emergency room of Broadlawns Medical Center in Des Moines, Iowa complaining of severe chest pain. Tr. at 280. Plaintiff was admitted to the intensive care unit and placed on a nitroglycerin drip, and administered other medications. Tr. at 281. On August 17, 2004, Plaintiff was seen at Broadlawns and reported that she was not having chest pain, but did have occasional tightness. Plaintiff denied shortness of breath with exertion with walking up stairs or walking. Plaintiff reported a history of migraine headaches with photophobia and phonophobia. She also reported a history of back pain after a fall the week before. Tr. at 313. On physical examination SI joint tenderness was noted, the legs had a full range of motion with slight pain on the right leg to internal rotation. The straight leg raising test was negative. Justin W. Ramsey, M.D., wrote that Plaintiff needed a cardiology follow-up to evaluate the need for a stress test or an angiogram. Plaintiff was given a prescription for amitriptyline as a prophylaxis against migraine headaches. The doctor opined that the most likely cause of Plaintiff's back pain was degenerative joint disease or osteoarthritis. Tr. at 312.

When Plaintiff saw Dr. Ramsey on September 22, 2004, it was noted that she would be seen for a cardiology evaluation at the Iowa Heart Center. Plaintiff reported her migraines were at a frequency of 2–3 per week lasting from hours to the entire day. She told Dr. Ramsey that the amitriptyline did not help and made her sleepy. On physical exam, there was significant tenderness over the SI spine. She was also noted to have muscle spasms which were exacerbated by moving during the examination. Tr. at 311. Amitriptyline was replaced with Neurontin. Tr. at 310.

On October 5, 2004, Plaintiff told Dr. Ramsey that she had seen a cardiologist. She said the doctor had reassured her about the results of a stress test and told her that no further tests were necessary. Plaintiff reported to Dr. Ramsey that she was having daily migraine headaches with nausea, photophobia, and phonophobia. Plaintiff also complained of low back pain. She had been sent for x-rays which the doctor wrote were essentially normal, with mild degenerative changes at L3 and L4. Tr. at 309. Plaintiff was told to increase the dosage of Neurontin and she was given an injection of Toradol for the headache she had while in the doctor's office. She was also given a prescription for Vicodin but instructed to limit its usage. Tr. at 308. When she was seen on November 8, 2004, by Jason D. Stecker, D.O., she was having a headache so she was given an injection of Toradol. Tr. at 305. When Plaintiff saw Dr. Ramsey again on December 3, 2004, the doctor made reference to an electrocardiogram performed by Dr. Stecker (see Tr. at 306) which showed no acute ST changes. Plaintiff reported having chest pain the night before and becoming short of breath while walking up stairs. Dr. Stecker had also ordered a CAT scan of Plaintiff's head because of his concern

for stroke. The scan was negative. Tr. at 304. Dr. Ramsey performed a EKG and the results of which were similar to the previous one. Plaintiff was given another injection of Toradol for her headache. Plaintiff was encouraged again to begin physical therapy and to do physical exercise. Tr. at 302. Plaintiff saw Dr. Stecker on December 28, 2004 for an injection of Toradol because of a migraine that had lasted four days. Tr. at 300.

When Plaintiff was seen at Broadlawns on January 13, 2005, it was noted that she had fallen down stairs on January 5. X-rays on the 5th were negative, and she was sent home with a prescription of Lortab. It was noted that the injury from the fall was in addition to Plaintiff's known osteoarthritis and degenerative joint disease. Plaintiff complained of worsening pain in her lumbar spine as well as SI joint tenderness. Plaintiff complained of pain in her shoulders and hips that traveled down both extremities. Plaintiff reported that she was having at least four migraine headaches each week. Dr. Ramsey's diagnosis was musculoskeltal myofascial pain in addition to chronic osteoarthritis/degenerative joint disease. Tr. at 410. Plaintiff was advised to take Flexeril and to follow-up in two weeks for treatment of her migraines. Tr. at 409.

On March 10, 2005, Plaintiff saw Tamra Richardson, D.O. at Broadlawns. Dr. Richardson noted that Plaintiff had been hospitalized from February 28 to March 2, 2005 during which time a myocardial infarction had been ruled out. Plaintiff continued to complain of heaviness in the left side of her sternum. Dr. Richardson's diagnoses were: Atypical chest pain, stable angina, and headache. Tr. at 382–83.

On March 22, 2005, Plaintiff saw Dr. Stecker complaining of three days of low back pain. Plaintiff reported no trauma or exertion. On physical examination bilater-

al lumbar muscle spasm was noted. Plaintiff was to continue taking Flexeril along with Relafen and she was given a prescription for Vicodin for severe pain. Tr. at 408.

On April 20, 2005, Plaintiff saw Dr. Ramsey. He noted that Plaintiff had been hospitalized in March, 2005, for heart problems and had been "ruled out with three enzymes." At the time of the examination, Plaintiff reported that her chest pain was stable—one or two episodes per week, lasting less than a half hour—but she reported shortness of breath with exertion. She also reported cramping pain in her calves which became worse with exertion, and a shooting pain from her back into her legs when walking. Tr. at 407. Under the heading Laboratory Data, Dr. Ramsey noted that Plaintiff had undergone a stress test which showed a left ventricular ejection fraction of 68% with no obvious infarcts or ischemia and no ST changes. The diagnoses were coronary artery disease, peripheral vascular disease, sciatica, and history of migraine headaches. Tr. at 406.

When Plaintiff saw Dr. Ramsey on May 19, 2005, she complained of chest pain. She said that the pain was happening at night and felt like heartburn, and that it was becoming more frequent. Tr. at 405. Dr. Ramsey scheduled a cardiac evaluation for Plaintiff at the University of Iowa on June 7, 2005. Tr. at 404. The Court does not find a record for the June 7, 2005 visit to the University.

When Plaintiff was seen at Broadlawns by James Chavez–Muramatsu, D.O. on June 30, 2005, it was for a follow-up to a recent hospitalization for pneumonia. Plaintiff reported that she had been doing very well and had no respiratory symptoms. She did, however, complain of low back pain, and bilateral knee pain. She said the knee pain had gradually been

getting worse. She said she was unable to stand more than 30 minutes, and that she heard a grinding noise in her knees when walking up stairs. The doctor ordered x-rays of both knees. Tr. at 403. The x-ray of the lumbosacral back showed small degenerative spurs, and degenerative character to the posterior element of the lumbosacral junction. X-rays of the knees showed minimal degenerative irregularities and no acute bony abnormalities.

On August 9, 2005, Plaintiff saw Dr. Chavez–Muramatsu on August 9, 2005. Plaintiff gave a two week history of pain and discoloration of her left great toe. Tr. at 402. Plaintiff was referred for a podiatry consultation. Tr. at 401. Plaintiff saw Patris Toney, D.P.M. (Tr. at 357–61) who admitted Plaintiff to the hospital for pain management with morphine, and to conduct vascular studies to assess the overall status of Plaintiff's blood vessels. Dr. Toney also ordered x-rays and bone scans. Tr. at 360. Plaintiff was discharged from the hospital on August 15, 2005. Tr. at 355.

On August 17, 2005, Plaintiff saw Thomas Payne, M.D. at Broadlawns. The doctor noted that Plaintiff's recent hospitalization under the care of podiatry. Plaintiff reported that a vascular study had been set up at the University, but she did not know when the appointment was. She came to the hospital because her toe was much darker and more painful. Dr. Toney was consulted and Plaintiff was sent to the podiatry department. Tr. at 400. Also on August 17, 2005, Plaintiff saw Dr. Chavez–Muramatsu who noted that Plaintiff had been admitted to the hospital on August 9, 2005 for the peripheral vascular disease. Plaintiff's left great toe was discolored and extremely painful to minimal palpation. Plaintiff agreed to a tibial nerve block injection. It was noted that she received relief before leaving the clinic. Tr. at 379.

On August 19, 2005, Plaintiff was treated by Dr. Chavez–Muramatsu for nausea, dehydration, and viral labyrinthitis. Tr. at 377.

On August 22, 2005, Plaintiff was admitted to Broadlawns with chest pain. Tr. at 365. An electrocardiogram showed normal sinus rhythm and no ischemic changes. Three sets of cardiac enzymes were normal. A chest x-ray appeared normal. On the morning of August 23, Plaintiff reported a new onset of chest pain which was not relieved with nitroglycerin, but was relieved with morphine. Tzvetan T. Naydenov, M.D. wrote: "Considering the typical nature and the classic presentation of the chest pain consistent with unstable angina in the context of normal cardiac work-up our suspicion of the cardiac origin of the chest pain remains strong." It was decided, therefore, to transfer Plaintiff by ambulance to the University of Iowa, and Plaintiff was instructed to be seen at Broadlawns one week after discharge from the University. Tr. at 366. Plaintiff was hospitalized at the University August 23–26, 2005. Tr. at 330–51.

On September 8, 2005, Dr. Chavez–Muramatsu noted Plaintiff's recent hospital admission by podiatry service due to peripheral vascular disease regarding her toe. Plaintiff also told the doctor that her hands undergo color changes when the weather is cold Tr. at 399. The doctor wrote that Plaintiff exhibits what appears to be Raynaud's syndrome. Tr. at 398.

On November 11, 2005, Plaintiff told Dr. Chavez–Muramatsu that her children were concerned that she walked with an unsteady gait. The doctor observed that Plaintiff was still smoking. Tr. at 397. On physical examination, however, her posture was normal, she could tandem without difficulty, and the Romberg was negative. Tr. at 396.

On December 16, 2005, Plaintiff presented at Broadlawns with a rash starting underneath the left breast and traveling toward her back, along with a shooting pain. Plaintiff said over the week that the rash had been present, the rash had decreased, but the pain remained the same at 10/10. It was noted that Plaintiff's toe was stable. Tr. at 395. On January 30, 2006, Plaintiff's peripheral vascular disease and Raynaud's phenomenon symptoms were getting worse and the skin changes had spread from the great toe to the second digit. Tr. at 393.

### ADMINISTRATIVE HEARING

At the hearing, Plaintiff testified that she has a 10th grade education. Tr. at 439. She testified that in addition to taking nitroglycerin tablets as needed for chest pain, she also takes tablets twice a day, and she wears nitro patches on her feet to keep the arteries open. Tr. at 149. She said when she takes nitroglycerin for chest pain, it causes "a bursting headache like no end.... Its worse than a migraine." She said the headaches last from a half hour to two hours. Tr. at 151. After the headaches have passed, Plaintiff said she feels "drained." The episodes of chest pain happen two to four times per week. She said that the chest pain will begin even if she is sitting playing cards with her grandchildren. Physical activity also brings the chest pain. Tr. at 152.

Plaintiff was asked if she had residual limitations from her double mastectomy. She responded: "Oh yeah, I can't pick up stuff like I use to. It pulls on me from the scarring. I can't get comfortable. Certain things I wear rub against it. Seat belts drive me crazy." Tr. at 455.

Plaintiff testified that she could stand 20 to 30 minutes after which she would need to sit for about 10 minutes. She said that she can walk about a half a block or walk up one flight of stairs. Tr. at 164. She testified that she can lift "no more than 10 pounds, and that's probably overextending it. If I even pick up a gallon of milk, it will pull on the start, and then I've got to take two hands and put it in the refrigerator." When asked if she could lift a gallon of milk regularly, she responded: "No. No." Tr. at 165.

Plaintiff testified that she takes medication for depression. When asked how the depression affects her, she responded that she is very short with people and that she spends a lot of time in her room alone. Tr. at 166. Plaintiff said she experiences fatigue: "Oh, all the time." Tr. at 167. She said she spends 80% of her day in her room. Tr. at 168.

Plaintiff said she did not think she could do a sit down job because sitting makes her knees ache and her toe to get cold. She said that sometimes the arthritis in her back makes it painful to sit. She also said there are a number of days when her chest pain would make it impossible for her to get up and go to work. Tr. at 470. She said that throughout the day, when she has chest pain, she must take her pills and lay down. Tr. at 471. Plaintiff testified that her children advised her not to drive because they are afraid she'll have a heart attack while driving. Tr. at 471.

Plaintiff said that at the time of the hearing she had not smoked for four months. Tr. at 477–78.

After Plaintiff finished testifying, the ALJ called Marian Jacobs to testify as a vocational expert. Tr. at 180. The ALJ's first hypothetical question mirrored his finding of residual functional capacity and the vocational expert's response was that such a person would be able to do Plaintiff's past relevant work. Tr. at 189. The ALJ's second hypothetical question, among other things, limited Plaintiff to lifting no

more than 10 pounds, standing 20 to 30 minutes at a time, and sitting 30 minutes at a time. The vocational expert testified that such a person would be able to do Plaintiff's past work as a motel desk clerk. Tr. at 190. She went on to testify that under the second hypothetical, Plaintiff would have transferable skills to the sedentary semiskilled job of information clerk in a public or private facility. Tr. at 190–91.

On cross examination, the vocational expert testified that the need to take unscheduled breaks to take nitroglycerin to relieve angina throughout the work day, would preclude competitive employment. The vocational expert testified that need for frequent absence from work would preclude competitive employment. Tr. at 192.

The ALJ gave the following reasons for finding that Plaintiff's testimony was not fully credible: 1) Her demeanor during the hearing did not lend too much credibility to her as a witness; 2) The claimant earned over $10,000 only once, and a couple of years she earned less than $2,000. This work history does not lend much credibility to her in her allegations about her work-related limitations; 3) The claimant described having some problems performing daily activities, but she can prepare meals, watch grandchildren, help clean, care for a dog, and shop; 4) The relevant medical evidence shows that the claimant's overall treatment history and the objective medical evidence fail to fully support the claimant (Tr. at 20); 5) Although examiners at times observed some signs and symptoms of the claimant's impairments, such as fatigue and muscle spasms, overall they did not consistently note abnormalities that would be expected to limit the claimant as severely as she alleged. Tr. at 21.

For reversal, Plaintiff makes four arguments. First, the ALJ's decision is not supported by substantial medical evidence from an examining source. Second, the ALJ failed to make a function-by-function assessment of Plaintiff's residual functional capacity that included the need for unscheduled breaks or absences. Third, the ALJ's *Polaski* analysis is deficient as the ALJ failed to affirmatively identify any inconsistencies in the claimant's allegations. And four, the ALJ erred in finding Plaintiff's past relevant work included work as a dispatcher when that work was never performed at the level of substantial gainful activity. Clerk's 7. The Commissioner argues that the ALJ properly assessed Plaintiff's residual functional capacity, and that the ALJ properly found Plaintiff can return to her past relevant work. Clerk's 10 & 13.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola* [*v. Astrue* ], 480 F.3d [885] at 886 [ (8th Cir. 2007) ] ). Rather, "[i]f, after reviewing the record, the

court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

█ In the case at bar, Plaintiff suffers from several impairments many of which seem to stem from her inability to stop smoking. She testified that she had finally been able to kick the habit, but unfortunately, the damage to her body appears to be irreversible. The medical history in this record begins with treatment for musculoskeletal pain. Soon thereafter she began treatment for cardiac problems resulting in angiography and angioplasty. The medical evidence establishes that Plaintiff's heart has been damaged with ischemia. The medical record establishes that Plaintiff is frequently treated for what the doctors consider to be credible complaints of angina. Plaintiff is frequently treated for migraine headaches, which the record establishes come as frequently as several times per week. Again, none of the doctors doubt the legitimacy of Plaintiff's complaints. X-rays of Plaintiff's low back and knees show degenerative changes which explain the pain of which she complains. Finally, Plaintiff developed peripheral vascular disease with a 70% stenosis of the left common iliac artery, and affecting the toes of her left foot.

Plaintiff testified that she is unable to sit or stand for any length of time without developing symptoms which cause her to retreat to a place she can lay down and recover. She testified that she is unable to lift more than 10 pounds on a very infrequent basis due to scar tissue from the double mastectomy which is also part of her medical history. She also testified that she still suffers from the headaches which cause her to confine herself in a dark quiet room until they pass.

█ The Court agrees with Plaintiff's first brief point, however more must be said about the duty owed by claimants attorneys to insure the full development of the record. A full record is especially important at step four. As Judge Richard S. Arnold wrote in *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc): "Probably the most important issue will be the question of RFC ..." The burden of proof at step four of the sequential evaluation remains with Plaintiff. *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir.2004). Although counsel made certain that all the available treatment records were in the record for the ALJ to evaluate, he did not request any of Plaintiff's physicians to review all the medical evidence and offer a professional opinion regarding Plaintiff's ability to function. Nor did he request the ALJ to order a consultative examination so that such an opinion could be submitted.

The Court in *Masterson,* at 737–38, went on to write:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001). "[S]ome medical evidence," *Dykes v. Apfel,* 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain

medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. *See* 20 C.F.R. § 404.1545(c); *Baldwin* [*v. Barnhart*], 349 F.3d [549] at 556 [ (8th Cir.2003) ] (internal citations omitted).

Here, there is no supporting evidence from a professional. Counsel is reminded that administrative hearing before Social Security administrative law judges are not adversarial in nature. The Court of Appeals for the Eighth Circuit has long held, and emphasized repeatedly, that ALJs and claimants' attorneys have an obligation to work together to insure that deserving claimants are awarded the benefits to which they are entitled. For example in *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994), the Court wrote:

> The Secretary acknowledges that it is her " 'duty to develop the record fully and fairly, even if . . . the claimant is represented by counsel.'" *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dept. of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir.1993). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394 (7th Cir. 1988).

The relationship between counsel and an ALJ is, therefore, different than in an adversarial system in both civil and criminal cases where "the principle of party presentation" is followed wherein the courts "rely on the parties to frame the issues for decision and assign to the courts the role of neutral arbiter of matters the parties present." *Greenlaw v. U.S.* —— U.S. ——, 128 S.Ct. 2559, 2564, 171 L.Ed.2d 399 (2008). Of course, it goes without saying that there are not two parties at a Social Security hearing. There is only the claimant with a single question before the administrative law judge, i.e. can this person work, as Judge Richard Arnold put it in *McCoy v. Schweiker,* 683 F.2d at 1147 "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." In this administrative system, the ALJ and counsel are expected to work together to achieve the goals envisioned by Congress when the disability amendments were added to the Act. While the ALJ must make findings of facts and conclusions of law he or she must still insure that a full and fair record has been developed. To this end, a skilled claimant's advocate is invaluable both to the ALJ and to the reviewing court. Likewise, when Congress decided, as an initial matter, to place adjudication of Social Security entitlement in the Social Security Administration itself, and to determine eligibility administratively, as opposed to judicially, it recognized that the expertise and efficiency that administrative adjudication could bring to both claimants and the Social Security administration. The vast number of claims, as well as the need for regulatory rules, have created within the Social Security Administration what one court has described as "the largest adjudicatory body on the face of the earth." *McDonald v. Southern Farm Bureau Life Ins. Co.,* 291 F.3d 718, 723 (11th Cir.2002.) This agency remedy, along with full judicial review ensures that the worker who has paid into the system will receive a full and impartial decision.

■ The Court also agrees with Plaintiff's second argument that the hypothetical presented to the vocational expert did not meet the standards set forth by the Eighth Circuit. The vocational expert's response, therefore, is not substantial evidence which supports the denial of benefits. As discussed in the statement of medical facts above, Plaintiff suffers from several impairments which cause excruciating pain and fatigue. Her migraine headaches are well documented as are her attacks of angina. Plaintiff suffers from peripheral artery disease which affects her lower extremities. In spite of these impairments and others such as her musculoskeletal myofascial pain and effects from the double mastectomy, the ALJ omitted pain and fatigue from his hypothetical. In *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir.1998) the Court, citing *Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994), wrote that hypothetical questions must fairly reflect the abilities and impairments of the claimant as evidenced in the record. The Court went on: "If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *See Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991)." In the case at bar, when the vocational expert was asked to consider Plaintiff's need to absent herself from work because of her pain, it was her testimony that no work is possible.

■ The Court also agrees with Plaintiff's third argument that the ALJ's credibility finding is a thinly veiled attempt to circumvent the standards set out in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984). There is nothing in Plaintiff's testimony or in the observations of the treating physicians regarding Plaintiff's daily activities to indicate she does not suffer from the pain to which she testified. The frequency and intensity of Plaintiff's pain is well established in the medical records. Plaintiff's pain is not necessarily precipitated by anything in particular and can occur even at rest. It is, however, aggravated by light and noise. Plaintiff's medication is helpful, but on numerous occasions she has had to visit her physicians for injection to stop the pain. There are no inconsistencies in this record which support a finding that Plaintiff is not credible. The ALJ pointed to the fact that Plaintiff has never been a high wage earner. While a good work record entitles a claimant to substantial credibility when claiming an inability to work, *Nunn v. Heckler,* 732 F.2d 645, 648 (8th Cir.1984), a history of low wage jobs does not necessarily mean a claimant is not credible. In *Gude v. Sullivan,* 956 F.2d 791, 795 (8th Cir.1992), the Court analyzed the reasoning of the agency in the exact same context as here:

> Finally, the ALJ disregarded Gude's subjective complaints because her past jobs were "low wage endeavors that provided no financial incentive to return to." This is an unacceptable reason to discredit Gude's subjective complaints of pain. It penalizes Gude for engaging in low-paying work, yet that is the most likely the only kind of work that gude's borderline intellectual functioning enabled her to perform. Moreover, Gude has no history of malingering. She worked at a variety of jobs until 1986 when she was hospitalized for SLE. Indeed, Gude left her last job not because she did not want to work as a babysitter, but because parents of the children she cared for complained that swelling from Gude's SLE interfered with Gude's work.

Furthermore, all of the physicians who have treated Plaintiff have consistently found her complaints credible and in need of immediate medical attention.

Because the vocational expert testified, on cross examination, that there would be no work for an individual with the limitations of Plaintiff's impairments, it is not necessary for the Court to address Plaintiff's final argument regarding the nature of her past relevant work.

■ There is no substantial evidence, medical or otherwise, to support a finding that Plaintiff is able to function in a competitive work environment, regardless of the exertional level required. The Court is reminded of *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980), in which the Court, citing *Brinker v. Weinberger,* wrote: "Employers are concerned with substantial capacity, psychological stability, and steady attendance" The Court went on to write that while the Commissioner need not find a specific job for a claimant, it must be shown that the claimant can *realistically* perform in existing employment. The Secretary failed to do so in *Rhines,* and the Commissioner has failed to do so in the case at bar.

In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote:

Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

## CONCLUSION AND DECISION

■ It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406(b)(1), and LR 54.2(b)[1]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

1. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."