**Dean Leonard BISSEN, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 1:10–cv–2 RP–TJS.**

United States District Court, S.D. Iowa, Western Division.

Nov. 22, 2010.

---

Marti D. Nerenstone, Council Bluffs, IA, for Plaintiff.

Richard L. Richards, U.S. Attorneys Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Dean Leonard Bissen, filed a Complaint in this Court on January 25, 2010, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed his applications for benefits on March 19, 2007. Tr. at 101–02. Plaintiff, whose date of birth is December 10, 1959 (Tr. at 101), was 49 years old at the time of a hearing on April 15, 2009. Tr. at 27. After Plaintiff's claim was denied initially and on reconsideration, he requested a hearing. The hearing was held before Administrative Law Judge Thomas M. Donahue (ALJ). Tr. at 24–50. On June 12, 2009, the ALJ issued a Notice of Decision—Unfavorable. Tr. at 9–19. On November 25, 2009, the Appeals Council denied the request for review making the ALJ's decision the final decision of the Commissioner. Tr. at 1. Thereafter, Plaintiff commenced this action.

Plaintiff is last insured for Title II benefits at the end of December, 2010. Tr. at 114. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since his alleged onset date of disability, December 13, 2005. At the second step, the ALJ found Plaintiff's severe impairments to be hypertension, orthostatic dizziness, "and non-severe chronic obstructive pulmonary disease." The ALJ found none of these impairments, or a combination thereof, qualifies Plaintiff to receive benefits at the third step of the sequential evaluation. At the fourth step, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except he can lift and carry 50 pounds occasionally and 25 pounds more frequently. He can sit 2 hours at a time for 6 hours of an 8 hour workday. He can stand 2 hours at a time for 6 hours of an 8–hour workday. He should be able to alternate between sitting and standing for a short period of time. He can walk 3 blocks at a time. He can occasionally climb ramps and stairs and balance. He should avoid ladders, ropes and scaffolds. He should avoid heights. He should not run heavy equipment.

Tr. at 14. Given that residual functional capacity, the ALJ found that Plaintiff is unable to do any of his past relevant work. At the fifth step of the sequential evaluation, the ALJ found that jobs exist in significant numbers which Plaintiff is able to do in his impaired condition. Tr. at 18. The ALJ found that Plaintiff is not dis-

abled nor entitled to the benefits for which he applied. Tr. at 19.

## MEDICAL & VOCATIONAL EVIDENCE

On March 26, 2005, Plaintiff was seen at the emergency room of the Crawford County Memorial Hospital. Earlier, at his home, Plaintiff was walking to his bathroom. The next thing he knew, we was on the floor and was waking up. Plaintiff reported that a similar episode had occurred three years before. Plaintiff was of the opinion that he had only lost consciousness for a few seconds or minutes. The only injury he noticed was some bleeding from his chin, which was stitched at the hospital. Plaintiff also complained of pain in the left side of his chest which he described as pressure. After an examination and review of laboratory work, Nicole Ewing, M.D. transferred Plaintiff, by ambulance, to Creighton University Cardiology for further care. Tr. at 178–79.

Plaintiff was admitted to Creighton University Medical Center on March 26, and discharged on March 28, 2005. During the hospitalization, Plaintiff was given tests to determine if his pain was of cardiac origin. All the tests were negative (See e.g. Tr. at 302 & 309). At the time of discharge it was felt that, because of recurrent episodes of syncope, Plaintiff should be given an outpatient event monitor and a tilt-table test. Tr. at 292.

On April 7, 2005, Plaintiff was seen by Gail Schlueter, P.T. for an injury to his left shoulder. He had been pinched between a gate and wall while working. Plaintiff was given physical therapy and was to see Daniel Larose, M.D. at the end of the month. Tr. at 199, See also Tr. at 188. On April 20, 2005, Dr. Larose noted that an MRI showed a small tear of the posteri-

or labrum. Tr. at 189. On May 18, 2005, Dr. Larose wrote that Plaintiff was doing well with "excellent strength and full motion." Dr. Larose wrote that from the point of view of the shoulder, Plaintiff could return to work. Tr. at 201.

On April 29, 2005, Plaintiff was seen by W. Paul Biddle, M.D. at The Cardiac Center, Denison Cardiology Clinic. Plaintiff was seen for "orthostatic hypotension[1] related to medications." The doctor wrote that the event recorder had not revealed significant arrhythmia, and that Plaintiff had no further syncopal episodes or dizziness. A stress test and an echocardiogram had not revealed evidence of ischemia. Plaintiff's blood pressure was 190/110. Tr. at 290. The doctor wrote that Plaintiff would be kept off work until his blood pressure was under control and he was not going to have recurrent episodes of orthostatic hypotension. The doctor said that once the blood pressure was under control, Plaintiff would be given a tilt table test. Tr. at 291.

On June 3rd, 2005, Dr. Biddle reported that Plaintiff's blood pressure was 170/100. The doctor adjusted Plaintiff's medication. The doctor wrote:

He will increase the Toprol XL to 100 mg daily. We will then have him follow up in two weeks and if his blood pressure is acceptable schedule the tilt test. If he passes the tilt test, we will allow him to go back to work. A note stating he will continue with long term disability was written today. He has spoken to his employers and they stated that the only job he can do is one where he has to work in livestock by himself. As we have discussed, this will produce potential hazard to him should he develop syncope.

1. A form of low blood pressure that occurs in a standing posture. Stedman's Medical Dictionary, 27th Edition.

Tr. at 289. On June 21, 2005, Plaintiff's blood pressure was 158/106. Plaintiff had no orthostatic dizziness or other cardiac complaints, so Dr. Biddle arranged the tilt table test. Tr. at 288.

Plaintiff underwent a negative tilt table test on July 1, 2005. Tr. at 304.

Plaintiff saw Dr. Biddle on August 12, 2005. Dr. Biddle noted that Dr. Li, who conducted the tilt table test, had released Plaintiff to go back to work and that Plaintiff had no recurrent episodes of dizziness or syncope since returning to work. Plaintiff told the doctor he was going to go bear hunting with a friend in Wisconsin. "Apparently this involves standing ten feet in front of a bear and taking a shot with a rifle or pistol." Tr. at 287.

On September 9, 2005, Dr. Biddle wrote that the previous week, while at work, Plaintiff felt shaky. He had no presyncope or palpitations, but didn't feel right. The work nurse found his blood pressure to be 168/114. Thereafter the doctor wrote: "his blood pressure subsequently is significantly improved and has been normal throughout this time." Tr. at 286.

On September 23rd, Dr. Biddle wrote that Plaintiff would be monitored with a 24 hour blood pressure cuff. Tr. at 285. Plaintiff wore the monitor on October 7, 2005. Dr. Biddle wrote that Plaintiff blood pressure control was satisfactory. Tr. at 284.

On January 3, 2006, Plaintiff reported to Dr. Biddle that he was off work due to excessive fatigue. Plaintiff's blood pressure was 180/112. The doctor noted that Plaintiff "drinks three to four beers nightly." Tr. at 282. The doctor adjusted Plaintiff's Toprol and began a prescription of Norvasc. The doctor wrote that Plaintiff should be excused from work indefinitely. Tr. at 283.

On January 13, 2006, Dr. Biddle noted that Plaintiff's liver enzymes were mildly elevated. Plaintiff's blood pressure was 152/90. Plaintiff related an episode of chest pressure when he was lifting some heavy boxes with a friend. Although Plaintiff had no further symptoms, he reported exertional dyspnea [2]. Tr. at 280. The doctor adjusted Plaintiff's medications because of Plaintiff fatigue, and said they would watch for orthostatic hypotension. The doctor said Plaintiff was to remain on short term disability. The doctor discussed Plaintiff elevated liver function test and noted the need for alcohol moderation. Tr. at 281.

On January 31, 2006, Dr. Biddle noted that Plaintiff had recently been in an auto accident. Tr. at 279. See Tr. at 232–34, emergency room record of the accident showing that x-rays of Plaintiff's right shoulder showed mild irregularity of the right clavicular. X-rays of the cervical spine were negative.

On March 10, 2006, Plaintiff told Dr. Biddle of an episode of syncope a week before. He was with a friend and suddenly lost consciousness. His friend told Plaintiff that he was only out for a few seconds. The doctor wrote: "This was not related to medication. It is not clear if other factors were involved." The doctor noted that Plaintiff's alcohol consumption was about the same. Tr. at 277. Plaintiff underwent a exercise tolerance test. The test was discontinued after 7 minutes, 51 seconds secondary to dyspnea and fatigue. The test was negative for ischemia. Plaintiff was told to avoid driving or putting him self in a position where he could hurt himself or others should he lose consciousness. Tr. at 278.

On April 4, 2006, Plaintiff told Dr. Biddle that he had not had any syncope since

---

**2.** Excessive shortness of breath after exercise.

Stedman's Medical Dictionary, 27th edition.

the March 10 visit. Plaintiff's primary complaint was exertional dyspnea which had improved with the Combivent inhaler, twice a day which the doctor increased to three times a day. The doctor said he would schedule pulmonary function tests. Tr. at 276.

On May 16, 2006, Dr. Biddle wrote that Plaintiff had not had an episode of orthostatic dizziness since March. "His medical history is complicated by exertional dyspnea with chronic obstructive pulmonary disease. He continues to smoke." In the same report, the doctor wrote: "Mr. Bissen can return to work from a cardiac perspective. His blood pressure is controlled and he has had no recurrent orthostatic symptoms.... His current limiting symptoms are dyspnea related to his underlying lung disease." Tr. at 274.

On June 1, 2006, Plaintiff saw Dan Schuller, M.D. for a pulmonology evaluation of his chronic dyspnea and abnormal chest x-ray. Plaintiff reported dyspnea with activities such as climbing stairs, walking at a fast pace in an incline, or bending over to tie his shoes. Tr. at 246. Plaintiff reported that he had been smoking for 25 years, but that he had recently cut back to a half pack per day. Plaintiff said that he drank 7 to 10 cans of beer per week. The consultation consisted of a review of Plaintiff's history, a physical examination, review of lab reports, x-rays and a CT scan, and a review of results of a pulmonary function test. The pulmonary function test showed a moderate obstructive abnormality with significant improvement after bronchodilator. Tr. at 247. Dr. Schuller's impression was that Plaintiff had a long history of tobacco smoking, and he had dyspnea on exertion which is "at least partially contributed by moderate obstructive lung disease." The doctor opined that the abnormal chest x-rays were due to previous chest trauma and multiple rib fractures. The doctor began Plaintiff on Spririva HandiHaler, and recommended that Plaintiff change Combivent to albuterol. The doctor encouraged Plaintiff to stop smoking. Tr. at 248

On June 23, 2006, Dr. Biddle noted Plaintiff's history of severe exertional dyspnea. The doctor wrote: "His exertional dyspnea has persisted, but he has no symptoms of syncope [or] dizziness." The doctor again stated that Plaintiff was stable from a cardiac perspective. Tr. at 272.

On September 19, 2006, Plaintiff told Dr. Biddle that he had recently had an episode of dizziness after standing for a period of time. Plaintiff sat down and the symptoms resolved. Tr. at 270. Plaintiff asked the doctor about his disability status to which the doctor replied that disability would need to be on the basis of pulmonary disease rather than cardiac disease. Tr. at 271.

On December 13, 2006, Dr. Biddle wrote a "To Whom It May Concern" letter:

> Mr. Bissen has been followed in the Creighton Cardiology Clinic in Dension. His cardiac condition is stable. He has occasional episodes of dizziness, so he should not be in a position where he cannot sit down or could injure himself should this occur. This would include working above ground level or operating heavy machinery. He has performed a cardiac stress test within the last year and these results can be forwarded if necessary. He has been evaluated by a pulmonologist in Harlan who will need to provide separate documentation for any work restrictions.

Tr. at 269.

On March 20, 2007, Dr. Biddle wrote that Plaintiff had no new cardiac complaints and had no chest discomfort, palpitations or syncope. Plaintiff's limiting factor was exertional dyspnea. Tr. at 267.

At the hearing, Plaintiff testified that his doctor restricted him from working above ground level, or operating any heavy equipment. He said his doctor required him to be able to sit down when feeling dizzy. He said his employer, Tyson Foods, could not accommodate those restrictions. Plaintiff said that he had applied for work with several employers, but none could tolerate the restrictions, even a fast food establishment. Tr. at 28.

The ALJ questioned Plaintiff about his alcohol consumption and smoking habits. Tr. at 29–31. Plaintiff testified that he drinks, but not every day, primarily because he doesn't have the money for it. He said that he lives on money borrowed against his home, and uses some to buy cigarettes. He said that he tries to quit smoking, but has not been able to quit. Tr. at 31.

Plaintiff's neighbor testified that he does Plaintiff's outdoor work such as mowing the lawn and shoveling the snow, because Plaintiff is unable to do it himself. Tr. at 38. The witness testified that he had been trained as a fireman, and had a first responder's license and was an emergency medical technician. Tr. at 40. He related the incident after Plaintiff had returned from the hospital and his blood pressure fell. Plaintiff did not want to return to the hospital because of the cost, so he stayed with him until the blood pressure went back into the normal range. Tr. at 41–42.

The ALJ called Roger Marquardt to testify as a vocational expert. Tr. at 44. The ALJ asked the vocational expert to consider a series of hypothetical questions:

First one is taken from Exhibit 13F [3]. It'd be age 49, a male. He has a twelfth grade education. Past relevant work as set forth in 15F [4]. Can lift 50 pounds occasionally, 25 pounds frequently. Sitting and standing up to two hours at a time, which at least could do at least six of and eight hour day in each of those positions. Should be able to alternate between sitting and standing. Only occasional climbing of ramps and stairs. Only occasional balancing. No working on ladders, ropes and scaffolds. No working at heights. No running heavy equipment.

Tr. at 45.

Second hypothetical ... Lifting 20 pounds occasionally, 10 pounds frequently. Sitting and standing with the ability to alternate position. Walking three blocks. No working on ladders, ropes, and scaffolds. No working on heights. No running heavy equipment. Walking three blocks. Only occasional climbing ramps and stairs. Only occasional balancing.

Tr. at 46–47.

Third hypothetical ... Walking of two, three blocks. Lifting 20 pounds occasionally, 10 pounds frequently. Sitting and standing up to two hours at a time with the ability to alternate positions and to do at least six of an eight-hour day in each of those two. Walking three blocks. No working on ladders, ropes, and scaffolds. No working at heights. No running heavy equipment. Only occasional balancing. Due to a drug and alcohol addiction, chronic pain syndrome, mental depression, mental impairment or any other reason the claimant would miss three or more days of work per month....

Tr. at 47.

Under none of the hypothetical questions, was Plaintiff's past relevant work

---

**3.** Exhibit 13F is found at pages 335 of the transcript. It is a residual functional capacity form completed by a physician at Disability Determination Services who neither treated nor examined Plaintiff.

**4.** See, Tr. at 177.

able to be performed. Under the first question, the vocational expert identified jobs such as cafeteria attendant, laundry worker, and cashier II. Tr. at 46. Those jobs could also be done under the second question with the addition of the job of bench worker. Tr. at 47. Under the third hypothetical, no jobs could be performed, even with the deletion of the words "drug and alcohol addiction" removed. Tr. at 48.

## DISCUSSION

 We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).) Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) The substantial evidence on the record as a whole test requires a scrutinizing analysis which requires consideration of supporting as well as detracting evidence. *Gavin v. Heckler*, 811 F.2d 1195,

1199 (8th Cir.1987), citing *Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In his brief, Plaintiff makes five arguments to urge the Court to reverse and order an award of benefits: 1) The ALJ erred by rejecting Plaintiff's complaints of limitations and by his failure to consider all of Plaintiff's exertional and non-exertional impairments; 2) the ALJ employed an erroneous daily activities standard; 3) the ALJ improperly rejected medical evidence and opinions; 4) the ALJ did not properly shift the burden of proof; and, 5) the ALJ proffered deficient hypothetical questions. Defendant takes issue with Plaintiff's arguments and urges the Court to affirm the final decision of the Commissioner.

 In the opinion of the Court, the ALJ erred in his finding at the second step of the sequential evaluation. The ALJ found Plaintiff's severe impairments are: "hypertension, orthostatic dizziness, and nonsevere chronic obstructive pulmonary disease." This finding is not consistent with the medical evidence in the record. Time and again, Plaintiff was treated for orthostatic hypotension, exertional dyspnea, and fatigue. May 16, 2006, Dr. Biddle wrote that Plaintiff's limiting symptoms are dyspnea related to underlying lung disease. The finding that Plaintiff's lung disease is a non-severe impairment, is not supported by the substantial evidence in this record.

In *Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir.1987), The Court quoted *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96

L.Ed.2d 119 (1987) for the proposition that only claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits without undertaking the subsequent steps of the sequential evaluation. (internal quotation marks omitted.) It is clear from the medical evidence in this record that Plaintiff's primary severe impairment is his lung disease. To have omitted that impairment from the subsequent analysis renders the final decision not supported by substantial evidence on the record as a whole.

▮ Since this case will have to remanded, the Court also finds there is also error at the fourth step of the sequential evaluation where the ALJ determined Plaintiff's residual functional capacity to be at the medium level of work. An ALJ is charged with determining residual functional capacity based on all the evidence in the record, but it is a medical question and must be supported by some medical evidence. *See, e.g. Masterson v. Barnhart*, 363 F.3d 731, 737–38 (8th Cir.2004):

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001). "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir.2000)(per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional.

*See* 20 C.F.R. § 404.1545(c); *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir.2003)(internal citations omitted).

▮ In the case at bar, the ALJ stated that he relied on the opinion of a physician who had never examined, let alone treated, Plaintiff. Such a statement is not substantial evidence upon which to base a denial of benefits. *Brock v. Secretary of Health and Human Services*, 791 F.2d 112, 114 (8th Cir.1986) ("The statements of physicians who never personally examined the claimant but only reviewed the reports of examining physicians, however, do not constitute substantial evidence on the record as a whole. *See e.g., Van Horn v. Heckler*, 717 F.2d 1196, 1198 (8th Cir. 1983)."). Furthermore, an ALJ may not draw his own inferences about the residual functional capacity from the medical records. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir.2004).

▮ It is also well settled law that an ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by an attorney. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir.1983); *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir.2004). In this case there is no medical evidence which directly addresses the question of Plaintiff's residual functional capacity. The ALJ should have ordered a physical examination either from one of Plaintiff's treating physicians, or from a physician selected by the Social Security Administration. Thereafter, that physician should be asked to render an opinion regarding residual functional capacity. It will then be necessary to reconvene a hearing to submit a proper hypothetical question to a vocational expert which includes all of Plaintiff's impairments and limitations.

▮ The Court agrees with Plaintiff that it is clear that the ALJ was concerned more about his alcohol consumption than about how his other impairments affected

his ability to work. The 1996 amendments to the Social Security Act prohibit benefits if alcohol or drugs are a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C). However, a finding of disability is a condition precedent to the application of the regulations regarding this statute. *Brueggemann v. Barnhart,* 348 F.3d 689, 693 (8th Cir.2003) citing *Bloch on Social Security* § 3.39 (2003). The ALJ must make a determination of disability without deductions for the assumed effects of substance use disorders. *Id.* at 694.

If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. *Pettit v. Apfel,* 218 F.3d 901, 903 (8th Cir.2000); 20 C.F.R. § 404.1535(b)(2). We have previously noted that when the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. *Pettit,* 218 F.3d at 903. Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.

*Brueggemann v. Barnhart,* 348 F.3d at 694–95.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The final decision of the Commissioner is reversed and remanded for fur-

ther administrative procedures and a new decision consistent with this opinion.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406(B), and LR 54.2(b))[5]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

**5.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."